Conaway *v.* New York Life Ins. Co. *et al.*

(*Nashville,* December Term, 1936.)

Opinion filed February 27, 1937.

METCALF, METCALF & APPERSON, of Memphis, for appellants.

MARION G. EVANS and JOHN B. SNOWDEN, II, both of Memphis, for appellee.

MR. JUSTICE CHAMBLISS delivered the opinion of the Court.

This bill was filed to enjoin foreclosure of a trust deed on complainant's home securing a debt held by the insurance company. She alleged that the debt had been paid to Turley-Bullington Mortgage Company, the local representative of the insurance company, authorized to collect the same. The chancellor decreed in favor of complainant, holding that the payment made to the mortgage company was binding upon the insurance company. The Court of Appeals affirmed and this court granted *certiorari* and has heard argument.

It is conceded that Mrs. Conaway paid this mortgage

indebtedness in full to the mortgage company, in the good faith belief that it was authorized to accept the payment. The insurance company denies that the mortgage company had such authority or that, by its course of dealing with the mortgage company, it had justified Mrs. Conaway in making the payment. This is the determinative issue.

This court is met at the outset with a concurrent finding and by the statutory provisions in the Act of 1925 creating the Court of Appeals, now Code, section 10620, providing that "to the extent that the findings of the two courts concur, they shall, if there be any evidence to support them, be conclusive upon any review of the facts in the supreme court." This rule of practice has been consistently followed. *Miller* v. *Kendrick,* 153 Tenn., 596, 285 S. W., 51; *Bray* v. *Blue Ridge Lumber Co.,* 154 Tenn., 342, 343, 289 S. W., 504; *Kenner* v. *City National Bank,* 164 Tenn., 119, 46 S. W. (2d), 46, 51; *Cooley* v. *East & West Ins. Co.,* 166 Tenn., 405, 61 S. W. (2d), 656. In the instant case it appears, recognized by the Court of Appeals, that the facts are practically undisputed. In effect, the assignments of petitioner to this court question the inferences and conclusions drawn by both courts from these facts.

Now, the concurrent finding rule above mentioned binds this court not only as to the concurrent finding of facts, but applies, also, to concurrently found inferences, *if justifiably drawn,* from these facts. In *Brown* v. *Timmons,* 110 Tenn., 148, 72 S. W., 958, 959, in which case this court reviewed a decree of the Court of Chancery Appeals affirming the chancellor, this court considered this question of practice. What was there said is applicable here, the concurrent rule being then in

force, and being the same in effect as that laid down in the Act of 1925. In the *Timmons Case* it was argued that when the Court of Appeals (then Court of Chancery Appeals) sets out the testimony in its opinion, this court will draw its own conclusions of both law and fact and the inferences or conclusions of the Court of Appeals will not be binding on this court. Judge Wilkes, writing the opinion, repudiated this insistence, saying that "the Supreme Court is bound by the finding of facts made by the Court of Chancery Appeals, and also by its inferences of fact from the evidentiary facts found and reported by them. Indeed, in its final analysis, it is the inference or conclusion of fact from the testimony in the record, and the evidentiary facts deduced therefrom by the Court of Chancery Appeals, that is binding and conclusive in this court. This court is bound by the findings of the Court of Chancery Appeals in its final deductions and conclusions of fact to the same, or even greater, extent than to its finding of detached or evidentiary facts," citing numerous authorities.

■ ■ This holding is consistent with the principle recognized and applied in trials by jury, the uniform practice in this state being that verdicts will not be directed by the trial judge except in cases where the facts are undisputed *and* there is no doubt as to the conclusions to be drawn therefrom. That is to say, it is the province of the jury not only to determine what are the proven facts, but what are the legitimate inferences to be drawn therefrom. By analogy, and consistently with the holdings of this court above referred to, construing a former statute of similar import to the act of 1925, we think there can be no doubt that this court is bound by a concurrent finding of the Court of Appeals and the chan-

cellor, not only as to the evidentiary facts, but as to all inferences and conclusions reasonably drawn therefrom. Moreover, this state has recognized the applicability of this concurrent finding rule in more than one case where the question was, as here, of agency. *Willcox* v. *Hines,* 100 Tenn., 524, 45 S. W., 781, 66 Am. St. Rep., 761; *Kenner* v. *City National Bank, supra.* In the latter case, Chief Justice Green, after reconciling suggested discrepancies between the findings of the Court of Appeals and the chancellor, held that these findings were substantially concurrent and said: "Here, then, is a concurrent finding of the lower courts that the complainants did confer upon Haun authority to act as their own agent in the matters before us." It was shown that the concurrent finding on this issue was rested upon circumstances, the effect of which the lower courts had construed and determined. The opinion cites Mechem on Agency (2 Ed.), section 261 et seq.; 21 R. C. L., 820; 2 C. J., 444, for the rule that "the fact of actual agency may be established, like any other fact, by circumstantial evidence." In the recent work, American Jurisprudence, volume 2, at page 359, it is said: "When the facts pertaining to the existence or nonexistence of an agency are conflicting, or conflicting inferences may be drawn from the evidence, the question presented is one of fact for the jury, or for the court as the trier of fact if the case is tried without a jury." This text is supported by citation of many authorities, and it has direct application here.

Now, in this view of the limited scope of inquiry in this court, it will be seen that it remains only for us to consider whether or not there are inferences to be fairly drawn from the undisputed facts supporting the concur-

rent conclusion that complainant was justified in paying her loan to Turley Company as agent for the insurance company. This is, after all, but a narrowed inquiry into the question whether or not there is any material evidence to support the concurrent finding. This inquiry necessitates a brief summary of the facts.

In 1916, T. J. Turley, acting for the corporation which bore his name, entered into an arrangement with the New York Life Insurance Company to act as its exclusive representative in Memphis in the matter of procuring for the insurance company residential mortgage loans. This arrangement, evidenced by correspondence, was also exclusive in obligating the Turley Company, in turn, to give the insurance company the benefit of all of its residential mortgage business. It appears that in practice this latter provision was not conformed to, as Turley subsequently came to represent other large institutions in like manner, but during all the sixteen years that followed, and until Turley's death in 1932, he continued to be the sole and exclusive representative of the insurance company, in the making and handling and collecting, if necessary by foreclosure, of loans of this insurance company. A business of many millions was transacted, and it is apparent that Mr. Turley enjoyed the highest confidence of the insurance company.

The exclusiveness of this representative relationship was extended in practice so as to provide and require that all negotiations and communications of the borrower should be had with and through the Turley Company. As expressed by the Court of Appeals, the Turley Company was made by the insurance company its ''sole mouthpiece for the purpose of dealing with its borrow-

ers'' in the Memphis territory. We quote, italics being ours:

"The contract provided that the selling company should 'exercise complete local supervision during the life of each loan,' and that the commission paid by the borrower should be 'in payment of all services to be rendered to the New York Life by the selling company during the life of the loan, *including the collection and remittance in New York exchange of both principal and interest,*' etc. And Mr. Thorne testifying for the Insurance Company stated that this local supervision includded:

"Looking after all the details, the details outlined in the arrangement between the New York Life and the loan company, the Turley-Mortgage Company, such as collecting maturing principal and interest items, reporting on taxes, assessments, etc., and seeing that we were supplied with proper fire insurance in companies acceptable to our company.' ''

The notes of borrowers were drawn payable to the Turley Company, or to bearer, at the office of the Turley Company, and here the interest and installments on principal, when provided for, were commonly paid, and likewise the principal upon maturity, except that, in some instances, the principal note, with the incidental title papers, insurance policies, etc., would be placed in a bank for collection and delivery.

We think there can be no doubt on this record that the Turley Company was the authorized agent of the insurance company, in habitually collecting and remitting the interest and the installment and maturity payments on such loans; or, certainly, the insurance company so held out the Turley Company as to render itself liable to in-

nocent parties, under the "apparent scope of authority" rule, for the collection of the items above enumerated. As defined by the American Law Institute, "Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other to act." Whatever its limitations, certainly the agency relationship as thus defined here existed. Conceding, as insisted, that in making originally this and other loans the Turley Company was primarily acting for and the agent of the borrower, it is, we think clear that, when the loan had been *once consummated,* and the insurance company arranged with the Turley Company to act for it as its local representative to look after and protect its security for the loan throughout its life in matters of insurance, taxes, collection of interest and principal, as it matured, foreclosure in case of default, etc., it adopted the Turley Company as its agent. From this, there can be no escape.

The particular facts of the case before us are these: We quote from the opinion of the Court of Appeals:

"The facts with reference to the Conaway loan are that on June 25, 1924, Mr. and Mrs. Conaway applied to the Turley-Bullington Mortgage Company for a loan of $2500.00 for five years with interest at the rate of 5½% per annum, payable semi-annually. On the same date they executed a deed of trust on their home securing such a loan; the property was appraised in the usual way; abstracts of title were furnished and delivered to the Title Department of the Bank of Commerce & Trust Company for examination for a title policy. By a letter of July 17, 1924, the Turley-Bullington Mortgage Company submitted an offer of said loan to the New York

Life, and after due consideration of said offer by its Finance Committee, the New York Life agreed to purchase said note; thereupon the note, trust deed, title guaranty policy, insurance policies and any other necessary papers, were forwarded to the New York Life on August 5, 1924; the papers were then submitted to the legal department, and being found in proper form, the New York Life on August 13th remitted to the Turley-Bullington Mortgage Company the sum of $2500.00 in payment for same. This closed the transaction for the purchase of said loan.

"On June 15th, 1929, Mr. and Mrs. Conaway applied to the Turley-Bullington Mortgage Company for an extension of said loan for an additional term of five years, and a new appraisal was made, showing the value of the property to be over $14,500.00. On July 2, 1929, the Turley-Bullington Mortgage Company submitted this application along with the new appraisal to the New York Life, and in a letter of July 12th, addressed to T. J. Turley, President, it agreed to extend the maturity of the loan for a term of five years, and directed the Mortgage Company to prepare and forward to it the necessary extension agreement for the approval of its general counsel. Such an extension agreement was prepared and was executed in duplicate and acknowledged by Mr. and Mrs. Conaway on July 27, 1929, and was forwarded to the New York Life on August 22, 1929; it was there approved and on September 12th, one copy thereof was forwarded to the Turley-Bullington Mortgage Company with instructions to deliver it to Mr. and Mrs. Conaway, but this was not done. Mr. and Mrs. Conaway received no communication whatever from the New York Life of its consent to said extension except the

statement of the Turley-Bullington Mortgage Company that it had agreed to the extension.

"Mr. Conaway, the husband of complainant, died in February, 1931. During his lifetime he had looked after the details in connection with this loan, and the property securing it, and there was never any default or delinquency of any kind. After his death, Mrs. Conaway's son, Edwin L. Conaway, looked after the matter for her.

"Shortly after Mr. Conaway's death, his son called to see Mr. Turley and told him that Mrs. Conaway would like to pay off the loan out of the proceeds of her husband's life insurance. Mr. Turley told him that he would have to get permission from the New York Life to accept payment of the loan at that time, and that he would write to the New York Life and explain the circumstances and advise him whether it would accept prepayment. In about ten days, Turley phoned to Edwin L. Conaway to come to his office. When he got there, Turley, in the presence of his secretary, Mrs. Johnson, told him that, in view of the circumstances, the New York Life had agreed to accept payment of the loan at that time; the amount of the interest and the cost of making the release were computed and a memorandum thereof given to Conaway. The latter then went to his mother and had her sign a check, payable to the order of the Turley-Bullington Mortgage Company, and took it to Turley who instructed Mrs. Johnson to give him a receipt 'in full,' which she did, and she then wrote across the face of the ledger account of this loan the words, 'Paid in full.' The amount paid to the Turley-Bullington Mortgage Company was $2540.58, which was the full amount due, principal and interest, to that date, plus

the cost of a marginal release, and the memorandum receipt so show. This payment was made on April 29, 1931.

"Conaway knew that Turley did not have the note in his possession at that time, and Turley promised to get them in the usual course. Conaway called several times at Turley's office to get them, but Turley always gave him some excuse for the delay and promised to get them right away, but never. did do so.

"The Turley-Bullington Mortgage Company did not write the New York Life Insurance Company of Mrs. Conaway's desire to pay off said loan before it matured, and did not remit to it the sum paid by Mrs. Conaway for that purpose. On the other hand, it kept the money, and paid the semi-annual installments of interest thereon which matured on July 1st, 1931, January 1st, 1932, and July 1st, 1932.

"Immediately after Turley's death on July 14th, 1932, Mr. Timlin, the Southern Manager of Mortgage Loans, whose office was in Atlanta, and another representative of the New York Life, Mr. McLeod, came to Memphis and made a thorough examination of the Turley-Bullington Mortgage Company's books and files, and thus learned for the first time of the payment of this loan to the Turley-Bullington Mortgage Company; on July 25, 1932, Mr. Timlin wrote to Mrs. Conaway to make future payments of principal and interest on her loan to the First National Bank. This was the first information Mrs. Conaway had that the Turley-Bullington Mortgage Company had not remitted to the New York Life the amount paid by her to it in satisfaction of her loan."

It is earnestly and ably argued (1) that not only was no authority in fact vested in the Turley Company to make a collection *before maturity,* but that the complain-

ant was put on notice of this particular limitation of authority at the time; and (2) the insurance company invokes application of the rule announced in *Griswold, etc., v. Davis,* 125 Tenn., 223, 141 S. W., 205, followed in later cases, thus fairly stated in the headnote:

"As a general rule the debtor is not justified in paying the principal debt to an agent of the holder who is not expressly authorized to receive it, unless the agent, at the time of payment, has in his possession the securities paid, and makes that fact known to the debtor; and, if the person to whom payment is made is not in possession of the written securities, the burden is upon the debtor to show that the one to whom payment was made had special authority to receive payment, or that he was represented by the creditor to have such authority."

We have no purpose to depart from this rule, but this case is distinguishable in at least two material regards. In the first place, unlike the *Griswold Case,* the Turley Company was vested by the owner of the debt with authority to act as its collecting agent for this and other loan debts, the limitation relating only to debts not matured. And, in the second place, deemed by us to have special significance, the record clearly shows that the insurance company exacted uniformly an unusual requirement, namely, that in all cases of payment of the principal note, despite the fact that it was in terms payable at the office of the Turley Company, in Memphis, the money should first be sent to its New York office and then, on this condition, the note and incidental papers would be sent to the Turley Company in Memphis for delivery. In other words, the insurance company by this arbitrary requirement itself precluded the obligor from demanding and receiving, when parting with his money

to the Memphis agency, the negotiable evidence of his indebtedness. By this same token it would seem that the insurance company might well be held to have precluded itself from reliance upon a rule which its own requirement made difficult of observance.

In this connection, we take from the opinion of the Court of Appeals the following statement of the general rule, quoted from 2 C. J., under Agency, sec. 262, p. 625, as to the payment to an ostensible agent of the holder of negotiable paper, who does not have possession thereof at the time:

"The mere fact that the agent has not possession of the notes or securities at the time of payment is not conclusive that he has no authority to collect the same, but is only a circumstance to be considered in determining the question; and the facts and circumstances may be such that, notwithstanding the agent has not such possession, he has actual authority, express or implied, to make the collection. Thus where a principal by his habits and course of dealing has held an agent out as having general authority to make loans for him, and to receive payments on the same, he may be bound by payments to the agent, *although the securities are not in the possession of the latter and although payments are accepted before maturity,* or are made to one who has had actual authority which has been revoked, but without notice to the third person." (Italics ours.)

On the facts of this record, we are unable to give determinative effect, either to the fact (1) that the debt was not due, or (2) that the note was not delivered. The limitation generally upon the authority to collect before maturity was brought home to young Conaway only by

the agent to whom he had made other payments on the debt and through whom only it was provided, by the requirements of the insurance company, that he might communicate touching the matter; and it was through this accepted and exclusive agency of the insurance company that he was advised of the willingness of the insurance company to accept his payment. All else that he might have done was to demand the contemporaneous delivery of the note. But, he was requesting a favor, and, as before shown, he was met by the requirement of the insurance company that the money in payment of the principal debt must be first remitted to New York.

Now, this court is confronted by a concurrent finding of the lower courts that the facts and circumstances so far justified this young man in the course he pursued, in dealing with a trusted, exclusive representative of the insurance company, over many years, as to bring into play for complainant's relief the maxim that, "Where one of two persons must suffer loss he should suffer whose act or neglect occasioned the loss," the reason of this maxim being that the equity of the one is less than the equity of the other.

We are unable to say that there are no *justifiable inferences* to be drawn from the facts to sustain this conclusion of these courts.

We have here an apt illustration of the reason of the well-settled rule that "the scope and extent of the agent's authority is to be decided from all the facts and circumstances in evidence, and is to be determined by the triers of the facts," here the lower courts. And "the apparent authority of an agent to act as the representative of his principal is also to be gathered from all the facts and

circumstances in evidence, and ordinarily this is a fact for the jury's determination." 2 Am. Jur., p. 360.

These quotations from Mechem on Agency (2 Ed.), are expressive of general applicable principles:

Section 1987: "The principal may, either expressly or by implication, put the agent in such a position or charge him with such duties, that the making of representations will fall within the scope of his authority, as where, expressly or by implication, he refers persons to the agent for information or authorizes him to do acts to which the making of representations is a necessary or a usual incident."

Section 1990: "The American cases have generally held the principal liable to innocent third persons where the representation was made in the course of the principal's business and apparently for his account and while the agent was acting within the general scope of his authority, even though in the particular case he was secretly abusing his authority and attempting to perpetrate a fraud upon his principal or some other person for his own ultimate benefit."

It may be conceded that the general rule of pertinent law is that authority, actual or implied, to collect for a holder-principal of an obligation at maturity does not extend to an obligation not due; and that Conaway must be presumed to have known that rule. But he did not act in disregard of it. He did not make his payment to the agent until he had undertaken to present through this agent his request for this concession, and been advised, in due course, that the holder had given its consent. As bearing directly on this point, we find the rule applicable thus clearly stated in the Restatement of the Law of

Agency by the American Law Institute, in section 170, as follows:

"Sec. 170—*Agent's Statements of Facts On Which His Authority Depends.*

"A disclosed or partially disclosed principal who invites third persons to rely upon the representation of an agent as to the *happening of a contingency upon which the authority of the agent depends,* is subject to liability upon contracts made with the agent by such third persons in reasonable reliance upon unauthorized and untrue representations of the agent *that the contingency has happened.*" (Italics ours.)

An illustration under the above section in the Restatement of the Law of Agency, is as follows:

"*Illustration* 1. P tells T that A is authorized to act for P until the return of B from Europe. T asks P how he will know when B has returned from Europe. To this P replies that *A will tell him.* B returns from Europe. T asks A if B has returned. A replies that he has not, and T thereupon enters into a transaction with A. P is bound by the transaction between T and A."

This rule of law is thus stated in *Oliver* v. *Huckins* (Tex. Civ. App.), 244 S. W., 625, 626, 631: "Ordinarily, where a principal directs a person to go to his agent for information, the principal is bound by the information given by the agent upon the subject referred to him. Mech. Law of Agency, vol. 2, p. 1350, secs. 1778, 1779."

In Mechem on Agency, in the section referred to, it is said:

"It is *not at all uncommon* for the principal to put an agent in a position in which the making of statements or representations or *the giving of information* is the act *expressly contemplated and directed.* Thus if the prin-

cipal refers a person to his agent for information the *agent is clearly authorized to give information* for the principal upon the subject indicated. If a principal carrying on an extensive business establishes a bureau of information, or *designates an* agent to whom inquiries may be referred or of whom information may be obtained, *the giving of such information* or the answering of such inquiries is an act which the principal has directly authorized.''

And in section 1987, it is said:

''The principal may, either expressly or by implication, *put the agent in such a position,* or charge him with such duties, *that the making of representations will fall within the scope of his authority,* as where, expressly or by implication, *he refers persons to the agent* for information or authorizes him to do acts to which the making of representations is a necessary or a usual incident.'' (Italics ours.)

And see section 1990 to like effect.

The Court of Appeals refers to numerous cases as similar in controlling facts to that before us, and as supporting their opinion, among them, *Equitable Life Assurance Society* v. *Thomas* (C. C. A.), 69 F. (2d), 361; *Pan-American Life Ins. Co.* v. *Texas Mortgage Loan Co. et al.* (Tex. Civ. App.), 22 S. W. (2d), 150; *Illinois Bankers' Life Association* v. *Grayson,* 125 Okl., 81, 256 P., 894; *American Life Insurance Co. of Detroit* v. *Bryan et al.,* 34 N. M., 215, 279 P., 561; *Conroy* v. *Garries,* 126 Neb., 730, 254 N. W., 262; *Northwestern Mutual Life Ins. Co.* v. *Blohm,* 212 Iowa, 89, 234 N. W., 268, and *State Life Insurance Co.* v. *Dupre,* 19 Tenn. App., 301, 86 S. W. (2d), 894, writ denied by this court. Lengthy quotations made from *Equitable Life Assur. Soc.* v. *Thomas, supra,*

are apparently much in point. In conclusion, the Court of Appeals says:

"We think the case before us is determined by the fact that the New York Life dealt with its borrowers only through the Turley-Bullington Mortgage Company; all requests of the borrowers had to be communicated to it through the Mortgage Company, and all its answers to such requests had to be communicated to them by the Mortgage Company. Having designated the Mortgage Company as its sole mouthpiece for the purpose of dealing with its borrowers, it must be held responsible for what the latter told them as its agent. Although there were many deviations by the Mortgage Company from the provisions of the written contract, so far as appears from this record, the New York Life never repudiated any act of Turley's or of his Mortgage Company up to the time of Turley's death; as Mr. Thorne reluctantly admitted, 'as long as the Company received its money, it was all right; but if it did not receive it, it was all wrong.'"

It appears that the statement by the Court of Appeals that the Turley Company had been made the "sole mouthpiece" of the insurance company is supported by the testimony of Mr. Thorne, in charge of the mortgage loan department at the home office of the insurance company in New York. Referring to the matter of prepayment of loans, he said:

"Q. You received the request from the Turley-Bullington Mortgage Company, did you not?

"A. We did.

"Q. 44. And it was the Turley-Bullington Mortgage Company that you notified that the request was granted?

"A. It was.

"Q. 45. You did not receive any communication from the borrowers themselves with respect to this matter, did you?

"A. We might have in rare instances, but as a general rule no, we did not.

"Q. 46. You do not recall any?

"A. I think I recall *indistinctly* one case where one borrower wrote in, and he was advised to take the matter up through the residential loan correspondent, the Turley-Bullington Mortgage Company.

"Q. 47. You did not expect to receive communications from the borrower, did you?

"A. We did not.

"Q. 48. And you did not notify the borrower directly, or communicate with the borrower directly, and advise him that the request was granted?

"A. That is correct; we did not.

"Q. 49. Now, do you know how the borrower received the information that his request was granted?

"A. I do not.

"Q. 50. The borrower, however, was expected to make payment of this granted request of this prepayment *to the Turley-Bullington Mortgage Company,* was he not?

"A. He was." (Thorne, Deposition, Tr. pp. 175, 176.)

On the same subject, when the examination was referring specifically to the Conaway loan, Mr. Thorne testified:

"Q. 384. Had the borrowers made application to your company for the privilege of prepaying their loan, *would that not have come through the Turley-Bullington Mortgage Company?*

"A. Undoubtedly.

"Q. 385. When your company received notice of the desire to prepay loans by borrowers was it not your custom, upon acceptance of such application of prepayment, *to notify the Turley-Bullington Mortgage Company* to relay this information on to the borrower?

"A. We notified the Turley-Bullington Mortgage Company of our willingness in such case. I don't think our notification *specifically* requested the Turley-Bullington Mortgage Company to notify the borrower. *It was presumed they would.*" (Thorne, Dep., Tr. pp. 205, 206.)

Mr. Conaway knew of this requirement of the insurance company and knew that the only source of information from the insurance company which was available was through the Turley Company. He so testified.

We conclude, that even if Conaway was in fact advised, or must be presumed *to* have known the governing rule of law, that Turley's authority to accept prepayment was contingent upon permission or consent of the home office, still the record is undisputed that when Turley thereafter informed him this permission or consent had been given, *Conaway in good faith accepted the information as true, and acted* upon it, and the insurance company was bound by the information so communicated to Conaway.

It results that the decree of the Court of Appeals is affirmed.