*(Nashville,* December Term, 1938.)

Opinion filed Dec. 17, 1938.

SIVLEY, EVANS & EVANS, J. E. McCADDEN, LARRY B. CRE-SON, COSTEN & CRABTREE, HAMILTON E. LITTLE, HOLMES, CANALE, LOCH & GLANKLER, BATES, SHEA & FRAZER, and McDONALD, McDONALD & BROWN, all of Memphis, PITTS, ·McCONNICO, HATCHER & WALLER, of Nashville, and EWING WERLEIN, of Houston, Tex., for complainants.

WILLIAM P. METCALF, CHARLES N. BURCH, H. D. MINOR, JOHN W. APPERSON, LUCIUS E. BURCH, JR., CHARLES M. CRUMP, and HENRY K. HOYT, all of Memphis (METCALF, METCALF & APPERSON and BURCH, MINOR & McKAY, of Memphis, of counsel)', for defendant.

MR. JUSTICE McKINNEY delivered the opinion of the Court.

This controversy involves the validity of the holographic will of Sister Mary Agnes Magevney, who died at her home in Galveston, Texas, March 4, 1891, the own-

er of real property, subject to the life estate of her sister, Mrs. Kate E. Hamilton, now deceased, located in the City of Memphis, the present value of which exceeds one million dollars.

This suit is a sequel to that of *Hugh Magevney et al.* v. *Blanche H. Karsch et al.*, reported in 167 Tenn., 32, 65 S. W. (2d), 562, 92 A. L. R., 343, to which reference is made for the devolution of said property.

The Sacred Heart Academy of Galveston, Texas, referred to herein as the complainant, an educational institution incorporated under the laws of Texas in 1885, and its charter renewed or extended in 1935 for a period of fifty years, insists that testatrix intended to devise all of her property to it although she erroneously named or described it. On the other hand, defendant, who inherits this property if the will is invalid, insists that the devise of testatrix was intended for an unincorporated religious association known as the community of Dominican Sisters of the Sacred Heart Convent of Galveston, Texas, and hence is void because indefinite as to its purposes and objects.

The chancellor and the Court of Appeals concurred in finding that testatrix intended that her property should vest in complainant corporation.

On account of the importance of the cause, as well as the large amount of property involved, we granted the petition for writ of *certiorari* in order that the court might have the benefit of argument by counsel, and the cause has been presented at the bar of this court with ability and zeal.

If the devise was to the corporation it was not necessary to designate the purposes and objects thereof in the will, the purpose of the corporation being the

"founding, conducting and maintaining an Academy and School" in the City of Galveston, in the State of Texas. *Durell* v. *Martin,* 172 Tenn., 97, 110 S. W. (2d), 316; *Carson* v. *Carson,* 115 Tenn., 37, 88 S. W., 175; *State* v. *Smith,* 84 Tenn. (16 Lea), 662.

The will was written by testatrix and is as follows:

"Will

"All for the honor and praise of our dear Blessed Mother! I, Sister Mary Agnes Magevney, of the Sacred Heart Convent—Galveston Texas, Will and bequeath all my property to the Blessed Virgin Mary Mother of My God and my most dear Mother, and Superioress of the Sacred Heart Convent Galveston Texas, for the use and benefit of the Dominican Sisters, the Community of the Sacred Heart Convent Galveston Texas. I appoint Rt. Rev. N. A. Gallagher Bp. of Galveston, or his successors in office, executor of this my last will and testament; and I will that all my said property, and effects, be subject to his control and at his disposal for the use and benefit of said Sisters and Community of Sacred Heart Convent. I will that Rt. Rev. N. A. Gallagher, Executor of this my last will and testament shall not be required to give bond, and that no formalities or requirements of the law shall be observed except *only* the *probating* of this my last will and testament.

"A few books and a small box containing private personal matter, I wish given to Bishop Gallagher *unopened.*

"Sr. Mary Agnes Magevney

"Witnesses—Sr. M. Francis, A.

"Sr. M. Louise

"Feast of All Saints

"Galveston

"Texas 1889."

■ We are of the opinion, as were the other courts, that the first sentence of the will is in the nature of a spiritual dedication; that by the relevant provisions of the will the devise was to the Rt. Rev. N. A. Gallagher, Bishop of Galveston, or his successors in office, in trust, for the use and benefit of "the Dominican Sisters, the Community of the Sacred Heart Convent Galveston Texas," and "subject to his control and at his disposal for the use and benefit of said Sisters and Community of Sacred Heart Convent."

If, at the death of testatrix, there existed two distinct organizations which were controlled and operated by said Dominican sisters, to wit, the unincorporated community of Dominican Sisters of the Sacred Heart Convent and the incorporated Sacred Heart Academy of Galveston, Texas, or if the latter was only a department of the former, then unquestionably there is no latent ambiguity in the will and the devise is to the unincorporated institution. On the other hand, if there never existed but one organization or institution, which was incorporated in 1885, and which functioned the same as previously, except that its status was changed from a voluntary to that of an incorporated educational institution, then the devise was intended to vest in the corporation.

■ Such a devise is not defeated by misnomer, and extrinsic evidence is admissible to identify the beneficiary. *Tarwater* v. *Baptist Orphans' Home,* 173 Tenn., 409, 119 S. W. (2d), 919; *Durell* v. *Martin, supra; Milligan* v. *Greeneville College,* 156 Tenn., 495, 2 S. W. (2d), 90; *Moseley* v. *Goodman,* 138 Tenn., 1, 195 S. W., 590, Ann. Cas., 1918C, 931; *Carson* v. *Carson, supra; State* v. *Smith, supra.*

The contention of defendant is that there is an unincorporated organization known as the ''community of Dominican Sisters of the Sacred Heart Convent of Galveston, Texas,'' whose primary object is the furtherance of the Christian religion, and that its secondary purpose is the secular education of young girls; that it was the intention of these Dominican sisters to limit the scope of the corporation to the secular educational work in which they were engaged; that Sister Mary Agnes Magevney was familiar with the dual activities of the organization, and with such knowledge, in plain and unambiguous language, limited her gift to the unincorporated institution.

It is the position of complainant that ''Dominican sisters'' is an order chiefly employed in teaching young girls; that when a number unite or band together for the purpose of conducting a particular school they are commonly designated or referred to as a ''community'' or a ''family,'' and that the building or buildings in which they reside and carry on their educational work is called a ''convent.''

The word ''community'' is thus defined in Webster's New International Dictionary: ''A body of people having common organization or interests, or living in the same place under the same laws and regulations; as, a community of monks.''

The same lexicographer defines the word ''convent'' as ''An association or community of recluses devoted to a religious life under a superior; a body of monks, friars, or nuns, constituting one local community;—now usually restricted to a convent of nuns; as, to go into a convent.''

The words ''Dominican nuns'' is thus defined by Webster: ''A strict order of nuns founded by St. Dominic

under a modified form of St. Augustine's rule, chiefly employed in teaching girls.''

It appears from the evidence that upon becoming a nun and entering a convent the sister, as she is denominated, is required to take a vow of poverty, and to be governed by the rules and directions of the community and its executive officers.

While these Dominican sisters are religious in character, we would infer from the foregoing definitions that the community of Dominican Sisters of the Sacred Heart Convent of Galveston, Texas, was an educational organization engaged in teaching girls. The fact that the curriculum includes religious instruction would not affect its status as an educational institution, since most denominational schools, as well as many non-sectarian schools, include religious instruction in their course of study.

Before referring to the testimony in this cause, we will briefly outline the history of the organization.

Sister Mary Agnes Magevney was born in 1841. Prior to the death of her father, Eugene Magevney, in 1873, in the City of Memphis, she renounced the world and became a Dominican nun. In 1874, she and Sister Rose Lynch founded the Community of the Sacred Heart Convent, an unincorporated association of Catholic sisters or nuns belonging to the order of St. Dominic, commonly referred to as Dominican sisters, in the State of Ohio. In 1882, the Community of the Sacred Heart Convent removed from Ohio to Galveston, Texas, acquiring property at the corner of Sixteenth and Market Streets, where a day and boarding school for girls was immediately established, and where it has been conducted continuously since that time by these Dominican sisters. On

October 27, 1885, on application of Sisters Mary Agnes Magevney, Rose Lynch and Louisa Curran, the three senior officials of the Community of the Sacred Heart Convent, the State of Texas issued a charter of incorporation to "The Sacred Heart Academy of Galveston Texas." Under the laws of that State this is a charitable organization. An example of the character of school conducted by these Dominican sisters is found in an advertisement appearing in the Galveston Daily News on August 23, August 25, and September 12, 1889, while Sister Mary Agnes Magevney was the Mother Superior, and which is as follows:

"Academy of The Sacred Heart,
"Galveston
"Under the Direction of the Dominican Sisters.

"This Academy reopens on Monday, September 2. The Academic Course is systematic and complete. Young ladies pursuing the regular course and passing a creditable examination will be given a diploma on graduating. Those who take only a special course will receive a suitable testimonial.

"Terms Per Month

"Board and tuition, including a full Academic Course, Latin, German, French, Piano, Washing, Bed and Bedding, Plain Sewing and Needle Work, $25 per month. Further particulars address

"Mother Superior."

In the book inscribed "Record, Sacred Heart Convent" the following entry appears in the handwriting of Sister Mary Agnes Magevney, to wit: "October 27, 1885. The Convent was chartered."

Numerous witnesses testify that testatrix, other mem-

bers of the organization, and the public in general, used the terms "Dominican Sisters," "Sacred Heart Convent," "Sacred Heart Academy," "Academy of the Sacred Heart," "Community of the Sacred Heart," and "Dominican Convent" interchangeably.

As an evidence of the indiscriminate use of the foregoing appellations it is shown that the diplomas were issued in the name of "Sacred Heart Academy of Galveston, Texas," while the corporate seal attached to said diplomas reads "Sacred Heart Convent."

The defendant neither testified nor introduced any testimony in her behalf. Her contention is based, primarily, upon the testimony of Bishop Byrne, successor of Bishop Gallagher, deceased, to the effect that "The primary purpose of every religious community is the sanctification of their own soul." We quote from the testimony of Bishop Byrne as follows:

"Q. Will you please explain the meaning of the word 'community' as used by a religious?

"A. 'Community,' as used by a religious, means a group of either men or women, voluntarily binding themselves by vows and agreements with one another and with the church to carry on certain works, live in a definite house, holding property in common and living according to a rule that is equal for all and binds all under the same obligations. They live in a definite house.

"Q. The Dominican Sisters are an international order, I believe; that is, there are Dominican Sisters all over the country, all over the world?

"A. Yes.

"Q. Now, a particular group of Dominican Sisters engaged in carrying on their work in a particular lo-

cality, what would be the proper name or designation for that local unit or local group?

"A. A definite group of them, living, for instance, like these sisters over here on D Street, you would call them a 'community.'

"Q. Is that the meaning of the word 'community' as used by a religious?

"A. Yes.

"Q. Communities of religious persons, are they invariably incorporated under the civil law of the state in which their work may be carried on?

"A. As far as my knowledge of religious communities goes, yes. They are all incorporated, because they have to hold property. In their work that they take up to do, they have to deal with the public, and, so far as my knowledge goes, they are all incorporated.

"Q. In their purely religious life, I take it, it would be unnecessary for them to obtain a legal charter from the state in which they happen to be located?

"A. Not at all. For their primary purpose, no, because, the primary purpose of every religious community is purely religious and purely spiritual.

"Q. You spoke of primary purposes. Will you explain what you mean by the primary purpose of a community and its secondary purpose?

"A. The primary purpose of every religious community is the sanctification of their own soul, their relation to God. They give up the world. They even give up their own name and come together and live under these religious names under a religious rule for the sanctification of their own soul, for the strengthening of virtues in their own soul, for the salvation of their own soul. It is purely religious. Every such community coming together

that way, well, they can't live on air. They have a secondary purpose. Some of them, then, have hospitals; some care for the sick and aged and orphans and these are the secondary purposes. To carry on these they must have property. They must buy and sell. They must deal with the public, and so that is what I call the secondary. The sisters of St. Dominic have for their secondary purpose the education of children.

"Q. Leaving aside now your classification of primary and secondary, and treating only with what you call their secondary purpose, dealing only with their secondary purpose, is it their primary duty and purpose in that secondary capacity to teach?

"A. Certain orders, yes.

"Q. The Dominicans I refer to.

"A. Yes, they are teachers.

"Q. They are teachers?

"A. Yes.

"Q. Is it any part of their secondary purpose, using the classification now that you have given when I say secondary, to practice indiscriminate charity in the relief of the poor?

"A. No.

"Q. Their purpose, then, is a teaching order?

"A. Teaching order. . . .

"Q. Bishop, inasmuch as you have so much better definition of what the word 'convent' conveys, I will ask you to state into the record what is the meaning of a Catholic convent? What meaning does it carry; what are its functions, its objects, its religious work and its charities?

"A. Religious work might be twofold. You might speak of 'convent' as the building in which sisters live

or in which monks live. Very often they apply the name to. a monastery building in which monks live, but even religious men speak of their home as the 'convent,' so it might refer to the house. Then, that word 'convent' too might refer to a religious community residing here. The sisters in such a convent are the Sisters of the Ursuline Convent. In fact, you might find Mother Mary John of the Ursuline Convent designating the house in which they live as the 'convent,' or a convent might mean again just the community, the residents of that particular house.

"Q. Does the Sacred Heart Convent fall within that definition you just mentioned?

"A. I think so, yes.

"Q. What are the functions and work of a convent, if we use the word in a religious sense instead of a material sense of property?

"A. The functions and works of a convent would be defined by the constitution and by-laws of the particular religious community owning that convent. That would vary. Some, as I mentioned a while ago, might be teaching. It might be the teaching of the poor, because we have some religious orders that are supposed to confine their teaching to poor children whose parents wouldn't be able to pay for them, and then they usually seek their living by alms in some way. It might be like these hospital sisters over here, care of the sick, care of the orphans and care of the aged. They have those threefold things. Under their constitution and by-laws they may teach. As a matter of fact, our group hospital sisters, however, have confined themselves to take care of the sick, care of orphans and care of the aged, so the works would be defined by the constitution and by-laws of the community of any particular convent."

Mother M. Angela O'Kane, who has been a Dominican Sister of the Sacred Heart Convent for forty-six years, and who was well acquainted with Sister Mary Agnes Magevney, gave this testimony:

"Q. What is the purpose of your Order, Sister, please?

"A. Educational, the teaching of children in all various schools and academies.

"Q. And your Order then, the particular branch to which you belong, to which your Community belongs, might be referred to as an order of teachers?

"A. Yes, teaching order.

"Q. And is it any part of the purpose of your Order, the purpose for which your Order is founded and for which it exists, to do nursing or to feed the poor or to relieve distress generally?

"A. Well, not as a part of our work. It would be as a Christian act to help the needy, but the primary object of our work is teaching in the schools. Of course, at times we have been charitable and tried to take care of everybody, but it isn't a part of our work.

"Q. Are there orders of Catholic ladies, for example, who make it their primary work to nurse?

"A. Yes, there are.

"Q. Are there orders of Roman Catholic ladies who made it their primary purpose generally to relieve distress of the poor and the unfortunate?

"A. Yes, we have different congregations. We have the Little Sisters of the Poor, and there are the Sisters of the Good Shepherd who take care of a certain class of girls and women. The Little Sisters of the Poor deal generally, I think, with charity.

"Q. Your particular Order is not founded for any of those purposes?

"A. No, sir, no. Our work is the education of children in schools and academies.

"Q. And when you say 'the education of children,' do you mean merely the teaching of Christian doctrine?

"A. No, sir, I mean in respect to the education, academic education, and primary, elementary and high school work. We have no colleges up to the present time. We just have academies, high schools and parochial schools. The parochial schools contain generally the elementary grades from first to junior high.

"Q. And I take it, of course, that while you primarily teach ordinary studies such as the public schools, of course, as a part of your course of instruction you teach Christian doctrines?

"A. Yes. That is one subject we must teach, religion.

"Q. You seek to inculcate Christian virtue in your students as well as educate them along cultural lines and practical lines?

"A. Yes.

"Q. What sort of institution, if any, has your Community conducted at 16th & Market Streets in the City of Galveston?

"A. What kind of institution?

"Q. Yes.

"A. Educational.

"Q. You conducted a school there?

"A. Yes, we always conducted a school there. We opened a school there in 1882. I think it was probably ready for occupancy in October. I am not sure about the date, but I think we arrived in Galveston the latter

part of September, and the school opened in October, and the school has continued there since.

"Q. You have continuously conducted a school there at that particular location?

"A. Yes, sir. I went to school there myself in 1885.

. .. .

"Q. Mother, we have, during the course of your testimony frequently referred to 'community.' Now, will you please state what the word 'community' means to a religious, that is, one who has entered holy orders in the Holy Roman Catholic Church?

"A. It means our religious family, members of the house or family. The sisters are members.

"Q. Does it or not designate a particular group who are banded together as a local unit?

"A. Yes, sir. . . .

"Q. Mother, will you please state, if you know, whether persons who are members of your Order generally refer to 'community' and use the term 'community' and understand the meaning of the term 'community' to be as you have just testified?

."A. Yes, sir."

Mother Mary Catherine Kenney has been a Dominican nun for more than fifty-one years. She was also well acquainted with Sister Mary Agnes Magevney. With respect to the Galveston institution, she gave this testimony:

"Q. Will you please state, Mother, what is the purpose of your community, what character of work your Community is organized to carry on?

"A. Teaching entirely.

"Q. You are an order of teachers, then?

"A.   An order of teachers.   We have continued that right from the beginning."

The testimony further shows that those teachers, comprising this particular community, are supported by the tuition fees collected from pupils and by an occasional small donation of money.

In *Conaway* v. *New York Life Ins. Co. et al.,* 171 Tenn., 290, 293, 102 S. W. (2d), 66, 67, it is said:

"Now, the concurrent finding rule above mentioned binds this court not only as to the concurrent finding of facts, but applies, also, to concurrently found inferences, *if justifiably drawn,* from these facts."

From the facts in the present cause the chancellor and the Court of Appeals concurred in finding that by virtue of the charter of incorporation issued to complainant the unincorporated community became merged into the corporation, and, after carefully considering the record in its entirety, we are unable to say that they were not justified in so holding.   Under the testimony it is apparent that this was an educational organization.   These Dominican sisters are trained as teachers to instruct young girls in the usual courses taught in our State grammar and high schools, with an added course of instruction in religion, such as is included in the curricula of many of our schools and colleges.   Sister Mary Agnes and her associates, upon arriving in Galveston, immediately purchased property and founded such a school as we have described above.   So far as appears from this record that was the only activity engaged in by these Dominican sisters.   That is their life work, which is separate and distinct from other activities of women of the Catholic faith.   We see no particular difference between this school and other educational institutions, with the

exception that all of these teachers are religionists or Christians, while in the faculties of some of our schools and colleges there are instructors who make no pretense to piety. Both, however, are educational institutions. Under the evidence in this cause if the educational feature of the organization was eliminated all that would be left would be a group of contemplatives, and the very foundation purpose of the order of Dominican sisters would be removed, and instead of engaging in their vocation of teaching they would simply pass their lives in religious meditation and prayer.

With respect to the statement of Bishop Byrne that "The primary purpose of every religious community is the sanctification of their own soul, their relation to God," he had reference to the spiritual side of life as distinguished from the material or physical. In this purpose these sisters are endeavoring to give heed to the injunction of the great Teacher: "But seek ye first the kingdom of God, and his righteousness." This should be the goal of every individual, regardless of what his vocation or profession may be. But, in order to gain the kingdom, one must minister to the material wants and needs of humanity in the manner indicated by the Christ as recorded in the twenty-fifth chapter of the Gospel by St. Matthew. And, in obedience to this command, certain of these Catholic sisters teach, others operate hospitals, maintain orphanages, administer to the necessities of the poor, etc. In order to engage in these various activities buildings must be secured, food obtained, and other physical necessities provided, necessitating the making of contracts. In order that this may be done, and more effectually to conduct this institution of learning, the unincorporated school was incorporated, but there

was no change in its objects and purposes, or in the manner of its administration.

The law deals with property rights rather than with spiritual matters. As testified to by Bishop Bryne, these sisters cannot live on the air. There are three hundred pupils in this school who pay, or are supposed to pay, tuition, which supports and maintains the institution. If the educational feature of this organization should be eliminated then these sisters would have no means of support.

In consideration of the foregoing, we are unable to escape the conclusion that there never was but one organization, its object and aim being the education of young girls, and that purpose has been consistently given effect by the continuous conduct of this school for more than half a century.

While these sisters individually and collectively are admonished to seek the salvation of their own souls, this was personal and incidental, and was not the primary purpose for which this institution was established.

In the minute entry referred to, we have the testimony of Sister Mary Agnes that *the convent was incorporated,* meaning, we think, the school, since the convent was simply the building in which these teachers resided and the school was conducted. Or she may have used the term in the sense of the organization. Evidently the devise was not intended for this particular group of Dominican sisters since they are required to take vows of poverty and are forbidden to receive and hold property.

The life work of Sister Mary Agnes Magevney had been that of teaching young girls, and we think it was her intention to leave her property to this particular school which she had founded, and to which the best years of

her life had been devoted. It is unreasonable to assume that Sister Mary Agnes, in disposing of her valuable estate, purposed to ignore the institution which she had created and nurtured, and have her property expended exclusively for the "sanctification" of this particular group of nuns who had already renounced the world and dedicated their lives to the service of the Lord. In any event, we think there is ample evidence to justify the other courts in concluding that there was but one organization, which was incorporated, and that the intention of testatrix was that The Sacred Heart Academy of Galveston, Texas, should receive her entire estate. This being true, it follows that the decrees of the chancellor and the Court of Appeals must be affirmed.

We have not referred specifically to certain other facts and circumstances relied upon by defendant in support of her insistence that the devise was not intended for the corporation. These matters were considered, but we think it is unnecessary to discuss them since our investigation has been directed primarily to the question as to whether there is any evidence to support the concurrent finding of the other courts, and we have found that there is such evidence.