IN THE MATTER OF: SCOTT WEBSTER BROWNLEE

No. 159

(Filed 6 January 1981)

**1. Appeal and Error § 7—who may appeal**

One who is not a party to an action or who is not privy to the record is not entitled to appeal from the judgment of a lower court.

**2. Appeal and Error § 7; Infants § 21—juvenile court order—requirement that county pay for treatment—no right by county to appeal—exercise of supervisory jurisdiction by appellate court**

Wake County did not have the right to appeal from orders entered by the district court in a juvenile delinquency proceeding directing the county to pay for the juvenile's treatment at the Brown Schools in Austin, Texas since (1) the county was not a party to the juvenile proceeding, and (2) G.S. 7A-667 did not empower a county to take an appeal in a juvenile proceeding. However, the Supreme Court will review the ordered entered by the district court pursuant to its supervisory powers under Art. IV, § 12(1) of the N.C. Constitution.

**3. Infants § 20—delinquent juvenile—order that county pay for out-of-state treatment—no authority by trial court**

The district court did not have the authority under G.S. 7A-649(6) to require Wake County to pay for the treatment of a delinquent juvenile at a facility in another state.

Justice CARLTON dissenting.

Justice EXUM joins in the dissenting opinion.

PURPORTED appeal by WAKE County from orders of *Bason, J.*, entered 22 August 1980 and 16 September 1980 in WAKE County District Court.

This proceeding was instituted and heard pursuant to the provisions of the North Carolina Juvenile Code, Articles 41-54 of Chapter 7A of the General Statutes. The proceeding was begun in October 1978 when the juvenile (Scott) was 14 years old. He was adjudged to be delinquent, and, subsequently, numerous alternatives were pursued in an effort to provide appropriate treatment for Scott.

All of these alternatives having proved unsuccessful, the court conducted a further hearing on 6 August 1980. Following that hearing and the entry of an order, the court conducted an additional hearing on 12 September 1980. A complete history of the case is best presented by quoting from the orders which were entered by the court following each hearing.

Pertinent portions of the 22 August 1980 order are as follows:

In re Brownlee

This cause came on for hearing on August 6, 1980, upon Motion for Review by Steven J. Williams, Chief Court Counselor, Tenth Judicial District. The following persons were present for said hearing: Scott Brownlee; Copper Rain, mother of Scott Brownlee; Steven J. Williams, Chief Court Counselor; and Martha Kay Mayberry, Wake County Department of Social Services. The respondent child was represented by Sandra L. Johnson, Attorney at Law. John C. Cooke, Assistant County Attorney, appeared on behalf of Wake County.

At the hearing on August 6, 1980, Mr. Cooke voiced the county's interest in said hearing in that the Motion for Review requested that the court consider the appropriate entity to provide financial resources to pay for needed treatment and educational services of the respondent child at the Brown School in Austin, Texas. Mr. Cooke further objected to testimony by the Chief Court Counselor regarding the opinions of others as to Scott's treatment and educational needs and as to information received from others regarding possible placements for Scott. The hearing was continued until August 18, 1980, upon the court's own motion so that those persons whose opinions were to be testified to by Mr. Williams could be present at the hearing and available for examination by the county attorney, and so that the county would have the opportunity to prepare and present evidence.

Wake County's Motion requesting that the court rule that said county is not a party to this juvenile proceeding was filed on August 11, 1980. Said motion came on for hearing on August 18, 1980. Mr. Cooke appeared on behalf of the county. The respondent was represented by Sandra L. Johnson. The court deferred its ruling on said motion and proceeded with the hearing over the county's objection.

. . . on August 18, 1980, having been continued from August 6, 1980.

* * *

After considering the factual evidence, including the testimony of witnesses, documents and written reports

concerning the child's condition and needs, the court finds the facts set forth below and enters its conclusions of law and judgment thereon as follows:

## FINDINGS OF FACT

1. The court takes judicial notice of and finds as fact all matters set forth in official court records related to the respondent child.

2. Scott was adjudicated delinquent on October 25, 1978. Disposition was continued for two weeks to allow time for development of treatment plan, with temporary placement at Wake House.

3. . . . . Said order incorporated by reference the report resulting from a psychological evaluation of Scott performed by Marguerite Robinson, M.A. on October 18, 1978, and called for implementation of the recommendations contained therein. Said psychological evaluation found Scott to be a child of above average intelligence with deep-seated emotional problems which keep him from using his intelligence to its potential and result in poor inner controls. Evaluation at Dorothea Dix Hospital was recommended, with temporary placement at Wake House to continue. The evaluation report pointed to Scott's probable need for long-term therapeutic intervention.

4. Scot was evaluated at Dorothea Dix Hospital during November of 1978 upon referral from Trentman Mental Health Center. Scott was denied admission to Dorothea Dix Hospital based upon a diagnosis of 'Impulse Ridden Personality.' Scott was found to be dependent upon his environment for control of his impulses, and treatment in a program offering external structure and controls with behavior management, probably throughout his adolescence, was recommended.

5. Scott was admitted to Duncraig Manor on March 14, 1979, from which he was discharged in May of 1979, as a result of behavioral problems.

6. Scott was adjudicated delinquent on June 25, 1979, and placed on twelve months probation.

In re Brownlee

7. Scott was adjudicated delinquent on November 19, 1979, and was committed to the custody of the North Carolina Department of Human Resources, Division of Youth Services, on said date. The court recommended that considerations be given to placement of Scott in several special programs operated by the Department of Human Resources and further requested that the Division of Youth Services advise the court, immediately following screening of what program was available for Scott. No treatment plan or information regarding available programs has been received by this court from the Division of Youth Services.

8. Scott was placed at Samarcand Manor by the Division of Youth Services, where he was considered for admission to the Title XX program but was not admitted to said program. Shortly after Scott arrived at Samarcand, Dr. Thomas Cornwall, a child psychiatrist consulting at Samarcand [examined him and found him to be anxious, depressed, and feeling that his situation was hopeless].

9. Scott was admitted to [Dorothea Dix State Hospital] for evaluation on January 21, 1980, and was discharged on February 27, 1980, upon findings that he is a child with 'long standing personality problems' in need of a safe environment where he can begin to learn to trust people and to tolerate limits being placed on him. Scott was diagnosed as suffering from an 'Impulse Ridden Personality with questionable Borderline Personality Organization' and was seen by the hospital as an inappropriate candidate for long term treatment at Dorothea Dix because he would not benefit from the intensive psychotherapeutic and pharmacological treatment available through the hospital's programs for adolescents.

10. Efforts by the office of the Chief Court Counselor to locate a placement for Scott in state-supported residential treatment facilities have been unsuccessful.

11. Scott remains in need of treatment for his serious emotional problems and of specialized educational services appropriate to his needs. He has not received and is not receiving appropriate educational services there.

Treatment and education appropriate to his needs are not available to him at Samarcand Manor.

12. It is the opinion of Dr. Cornwall who was directly involved in Scott's evaluation at Dorothea Dix Hospital, and of Dr. Lenore Behar of the Division of Mental Health Services that no residential treatment facility appropriate to Scott's needs currently exists in the State of North Carolina, and no such program is known to the court.

13. The educational and psychiatric needs of Scott Brownlee while committed to the custody of the Division of Youth Services have not been met.

14. The Director of the Division of Youth Services did not exercise his [option] under G.S. 7A-665 to seek an alternative disposition for a juvenile committed to the care of the Division and found not to be suitable for its program.

* * *

16. The court now finds that its order committing Scott to the custody of the Division of Youth Services is not in his best interest and further finds that said commitment is inappropriate in that the court's increased awareness of the severity of Scott's emotional disturbance and the extent of his behavioral problems, together with the court's findings that his treatment and educational needs have been and continue to be unmet; constitute a change in circumstances which requires that the court vacate and revoke its prior order of commitment.

17. Scott has nowhere to go as of the date of this order, and it is not in his best interest to vacate his commitment to training school effective today.

18. Upon recommendation of Dr. Cornwall and as a result of efforts by his court counselor, Scott had been accepted for admission to the Brown School in Austin, Texas. The Brown School is a residential treatment facility which offers both appropriate treatment for his severe emotional and behavioral problems and appropriate specialized educational services. The costs associated with placement at the Brown School are in excess of $40,000 per year.

19. No appropriate treatment alternatives other than the Brown School are known to the court at this time.

20. Scott's mother, Copper Rain, is employed as a bartender. Her net weekly salary is $105.00 per week. She has two other children who reside with her for approximately 105 days per year. She has no health insurance or other assets from which she can pay for the cost of care at the Brown School or any other residential facility. Ms. Rain's effort to secure support from Scott's father through Interstate Child Support Enforcement proceedings have been unsuccessful to date.

21. The Department of Human Resources is not now able to purchase care for Scott in a private residential treatment facility for the reason that no funds have been appropriated for the purpose of purchasing private residential care for emotionally disturbed children.

\* \* \*

23. The court is hopeful that the North Carolina Department of Human Resources, Wake County Area Mental Health Program and the Wake County Board of Education will develop an appropriate treatment and educational plan for Scott which can be implemented immediately and/or will identify and make available funds necessary to provide or purchase such appropriate treatment and education at the Brown School or in some other appropriate program.

24. If such plans and/or funds are not forthcoming, this court will have no resource other than Wake County to which it can look for funds necessary to purchase the treatment Scott needs.

## CONCLUSIONS OF LAW

A. Upon review, the court concludes that its order committing the respondent child to the custody of the Division of Youth Services is not in said child's best interest. The current needs of the juvenile and the change in circumstances since said order was entered require that the court vacate and revoke its prior order of commitment pursuant to N.C. G.S. § 7A-664 (a).

B. Scott Brownlee is in need of treatment and care for his severe emotional problems and of specialized educational services. He is not receiving said services at this time.

C. Scott's mother is unable to pay the cost of the care and treatment Scott needs.

D. This court, in this proceeding, does not have the authority to order the Department of Human Resources, Wake County Area Mental Health Program or the Wake County Board of Education to provide particular treatment or funding of treatment while the juvenile is committed to the custody of the Division of Youth Services.

E. If an appropriate treatment and educational plan for Scott is not developed and funded by the Department of Human Resources, and/or Wake County Area Mental Health and/or the Wake County Board of Education, the court's only alternative for securing the funds necessary to provide the treatment Scott needs will be to charge the cost of said treatment to the county pursuant to G.S. § 7A-647 (3).

* * *

A. This court's commitment of Scott Brownlee to the custody of the Division of Youth Services is hereby vacated and revoked effective September 12, 1980, pursuant to N.C. G.S. § 7A-664.

B. Disposition in this matter shall be continued until September 12, 1980.

C. The North Carolina Department of Human Resources, Wake County Area Mental Health Program and the Wake County Board of Education are hereby requested to attempt to make available funds necessary to secure placement for Scott Brownlee in the Brown School or some other appropriate treatment facility or to develop and arrange for immediate implementation of an appropriate treatment and educational program by September 12, 1980, and to inform the court of the results of said efforts on or before that date.

D. Wake County is hereby notified that if an appropriate treatment and educational plan or funds to secure placement in any appropriate program are not forthcoming from other sources on or before September 12, 1980, this court will on that date turn to the county for any information and assistance it may wish and/or be able to offer regarding placement of Scott in an appropriate treatment facility which is less expensive than the Brown School.

E. The court requests that the county participate in the dispositional hearing on September 12, 1980.

On 11 August 1980 Wake County filed a motion in the cause asking the court to rule that Wake County is not a party to the proceeding. Thereafter, the court ruled that the County was not a *necessary* party but, as stated in the above order, requested the County to participate in the dispositional hearing scheduled for 12 September 1980. The record indicates that the County did not participate in that hearing.

Pertinent portions of the 16 September 1980 order are as follows:

This cause came on for hearing on September 12, 1980, with disposition having been continued until said date by Order entered August 22, 1980.

After considering the factual evidence, including the testimony of witnesses, documents and written reports concerning the respondent child's condition and needs and the programs and resources available to meet those needs, the court finds from the facts set forth below that the following disposition would best provide for the protection, treatment, rehabilitation and correction of the child.

### FINDINGS OF FACT

1. The court takes judicial notice of and finds as fact all matters set forth in official court records relating to the respondent child.

2. The court takes judicial notice of and hereby incorporates by reference all matters set forth in its order of August 22, 1980, in this matter.

3. Copies of this court's order of August 22, 1980, were served on the following persons:

* * *

Mr. John C. Cooke, Assistant Wake County Attorney:

* * *

Mr. Carl Johnson, Wake County Manager; and

Mr. M. Edmund Aycock, Chairman, Wake County Commissioners.

4. The court regrets that Wake County did not participate in the hearing on September 12, 1980, as requested by Order entered on August 22, 1980.

5. A proposal requesting funding to implement an appropriate treatment plan for Scott in Wake County was submitted to the North Carolina Department of Human Resources following entry of this court's order of August 22, 1980. Wake County Schools agreed to provide the funding necessary for the educational component of the plan. Funding for said proposal was denied by the Department of Human Resources on September 11, 1980. The court appreciates the efforts of Mr. Kirkpatrick, Ms. Lambe and others involved in these efforts and regrets the decision of the Department of Human Resources.

6. A proposed placement and treatment plan was presented by Lenore Behar, Ph.D., on behalf of the Department of Human Resources. The Department proposed placement in a new residential program for children between the ages of 10 and 17 to be developed on the campus of John Umstead Hospital. Dr. Behar testified that she did not know who in the Department of Human Resources decided that placement in the proposed program at John Umstead Hospital would be appropriate for Scott, that she was not involved in that decision and that she was instructed by her superiors on September 11, 1980, to develop a plan for Scott's placement in that program.

7. The proposed program at John Umstead Hospital is not yet in existence. Renovations to buildings have not

been completed and not all of the staff has been hired. Dr. Behar testified that she did not know when the rest of the staff will be hired. The screening procedures for admission to the program are not yet in place and it is not possible for the court to determine the ages or conditions of other children with whom Scott would be living and interacting.

8. The Department of Human Resources' proposed written plan for Scott's treatment includes an accurate description of Scott's needs and strengths and specifies appropriate long and short term treatment goals. However, the court is not able to find from the evidence before it that the plan, whenever it could be implemented, would be an appropriate placement or would constitute an appropriate treatment plan. There is no evidence before the court from a psychiatrist familiar with Scott's condition and needs relating to details of the program to be offered to Scott by the proposed program at John Umstead Hospital and there is no opinion from such a psychiatric expert that placement in the program would be appropriate and in Scott's best interest.

9. Scott was discharged from Samarcand Manor on September 3, 1980. Scott has been in the custody of the Department of Human Resources since November 19, 1980. He was evaluated at Dorothea Dix Hospital in January and February of 1980.

10. The court appreciates Dr. Behar's appearance at the hearing and her efforts to develop the plan suggested by the Department of Human Resources.

11. The court finds again that Scott Brownlee is in need of treatment for his serious emotional problems. The court further finds again that no treatment facility appropriate to Scott's needs currently exists in the State of North Carolina.

12. The 'Brown Schools' is in reality a system of residential psychiatric treatment programs in Texas. Said program includes a variety [of] residential treatment facilities and specialized programs, each of which offers specialized services according to the needs of the patient.

All programs of the Brown Schools are accredited by the Joint Commission on Accreditation of Hospitals.

13. The court finds that the Brown Schools offer appropriate treatment for Scott, which treatment is immediately available to him in that he has been accepted for admission and that the court was informed at the hearing on September 12, 1980, that he can be admitted to the program's Short-Term Adolescent Center as soon as necessary paper work is completed.

14. The court finds that no appropriate placement and treatment plan other than that available at the Brown Schools is known to the court.

15. The court finds that costs associated with treatment at the Brown Schools are consistent with costs at other treatment facilities and are less than those associated with treatment in some residential psychiatric treatment programs. Specifically, the cost of treatment in the Adolescent Admission Service, Ward 601, Dorothea Dix Hospital is approximately $65,000 per patient per year.

16. The court specifically incorporates herein its finding in the Order of August 22, 1980, that Scott's mother is unable to pay for the cost of the treatment he needs. Her net income is approximately $105. per week. She has two other children who reside with her approximately 105 days per year. She has no health insurance or other income or assets with which to pay for the treatment Scott needs. Her efforts to secure support for Scott from his father through Interstate Enforcement Proceedings have been unsuccessful.

17. Scott is in need of care and supervision which his parent cannot provide and is in need of placement. Placement of Scott in the Brown Schools will be facilitated by placing him in the custody of the Wake County Department of Social Services in that his mother is not able to make the financial arrangements necessary for admission.

18. Admission to the Brown Schools does not require a commitment that the child will remain a patient there for any particular period of time. Charges are made for

services actually rendered and are charged on a daily basis between admission and discharge.

19. In addition to daily charges, other costs associated with treatment at the Brown Schools include costs of transportation, medical and dental care and clothing.

20. The court remains hopeful that an appropriate placement and treatment program for Scott will be developed and funded in Wake County or elsewhere in North Carolina and remains ready to consider modification of this Order if it can be shown that such a program does exist and that transfer to that program will be in Scott's best interest.

21. The court finds that it is in Scott's best interest that he be admitted to the Brown Schools immediately in that he has been waiting for appropriate placement and treatment for many months and that no other alternative is available. Further delay in appropriate placement and commencement of appropriate treatment will be damaging to him. The court further finds that there is no assurance that this placement and the treatment it offers this seriously disturbed child will remain available if he is not admitted at once.

## CONCLUSIONS OF LAW

A. Scott is in need of care and supervision which his mother cannot provide and is in need of placement.

B. Scott is in need of psychiatric, psychological and other treatment of his serious emotional problems. Placement in the Brown Schools is in Scott's best interest.

C. Scott's mother is unable to pay the cost of the care and treatment he needs.

D. Scott's great need of immediate treatment, the immediate availability of such treatment at the Brown Schools and the long delay in receiving appropriate treatment to which Scott has already been subjected compel immediate placement at the Brown Schools.

E. This court has the authority to order the treatment Scott needs and to charge the cost to Wake County pursuant to G.S. 7A-647 (3).

IT IS THEREFORE ORDERED:

1. Scott Brownlee is hereby placed in the custody of the Wake County Department of Social Services pursuant to G.S. 7A-647 (2) in order to facilitate placement at the Brown Schools.

2. Scott Brownlee is hereby ordered to the Brown Schools for residential treatment pursuant to G.S. 7A-649 (6).

3. All arrangements necessary for Scott's *immediate* admission to the Brown Schools shall be made by the Chief Court Counselor and the Wake County Department of Social Services.

4. The cost of Scott's care at the Brown Schools shall be paid by Wake County pursuant to G.S. 7A-647 (3). The county is hereby ordered to cooperate with the Chief Court Counselor and the Department of Social Services in making the arrangements necessary for Scott's *immediate* admission to the Brown Schools.

5. The Wake County Department of Social Services is hereby relieved of responsibility for identifying alternative placements for Scott until such time this court's order for placement at the Brown Schools is vacated or modified.

6. This order and Scott's placement at the Brown Schools shall be implemented immediately pursuant to G.S. 7A-668 notwithstanding appeal by any interested party.

7. The court will consider modification of this Order upon motion of any interested party at such time as it can be alleged that appropriate treatment and placement for Scott Brownlee at a program other than those offered by the Brown Schools is actually available and that transfer to such program would be in his best interest.

On 28 August 1980 Wake County gave and served notice of

appeal to the 22 August 1980 order. The County also petitioned the Court of Appeals for writs of prohibition and mandamus; the petition was denied without prejudice.

On 17 September 1980 Wake County gave and served notice of appeal to the 12 September 1980 order. On the same day, the County again petitioned the Court of Appeals for a writ of mandamus or, in the alternative, a writ of supersedeas; it also asked for an order temporarily staying the orders of the district court. On 23 September 1980 the Court of Appeals granted a temporary stay but on 25 September 1980 it dissolved the stay and denied the petition for mandamus and supersedeas.

On 29 September 1980 Wake County applied to this court for a temporary stay of the orders entered by Judge Bason pending preparation and filing of a petition for a writ of certiorari. On 30 September 1980 this court, feeling that an expedited decision of this case is in the public interest, elected to invoke Rule 2 of the Rules of Appellate Procedure and ordered: (1) that the application for a stay order be denied; (2) that the petition be treated as a motion to bypass the Court of Appeals and that the motion be granted; (3) that the times for filing the record on appeal and the briefs be accelerated; and (4) that this matter be specially set for hearing at the December 1980 session of this court. [1]

*John C. Cooke, Assistant County Attorney, for petitioner-appellant, Wake County.*

*Johnson & Johnson, by Sandra L. Johnson, for respondent-appellee, Scott Webster Brownlee.*

BRITT, Justice.

The present case brings before this court two principal questions for our consideration: (1) whether Wake County is entitled to appeal from the orders entered by Judge Bason; and (2) whether the district court was empowered to direct the county to provide care

---

[1]This court took note of the fact that arrangements for Scott's admission to the Brown Schools had been made; that he was to be admitted at 9:00 a.m. on Wednesday, 1 October 1980; that transportation arrangements to Austin, Texas had been made for the afternoon of 30 September 1980; and that the Wake County Board of Commissioners on 23 September 1980 had passed a resolution appropriating the sum of $16,000 to the Wake County Department of Social Services to cover the estimated cost of three months initial care, travel to and incidental expenses at the Brown Schools.

for respondent at the Brown Schools in Austin, Texas. These issues are separate and distinct. Accordingly, it is appropriate for us to examine each one independently of the other.

## WAKE COUNTY'S RIGHT TO APPEAL

[1] G.S. § 1-271 codifies the common law rule that "[a]ny *party* aggrieved may appeal in the cases prescribed in this chapter." (Emphasis added.) *See Duke Power Co. v. Salisbury Zoning Board of Adjustment*, 20 N.C. App. 730, 202 S.E.2d 607, *cert. denied*, 285 N.C. 235, 204 S.E.2d 22 (1974). One who is not a party to an action or who is not privy to the record is not entitled to appeal from the judgment of a lower court. *Siler v. Blake*, 20 N.C. 90 (1838).

[2] It is clear that Wake County was not a party to the present action when it came on for hearing before the district court. In his order of 22 August 1980, Judge Bason gave notice to Wake County that the court would turn to the county to bear the cost of providing care for Scott in the event that the North Carolina Department of Human Resources, the Wake County Area Mental Health Program, or the Wake County Board of Education were unable to develop and fund an appropriate program of treatment for the child. In that order, Judge Bason specifically requested the participation of the county in the dispositional hearing which he scheduled for 12 September 1980. In particular, the county was directed to provide the court with "any information and assistance it may wish . . . or be able to offer regarding placement of Scott in an appropriate treatment facility which is less expensive than the Brown School." Notwithstanding this notice of the intention of the district court, the county elected not to participate in the dispositional hearing. There is no dispute, upon the present record, that the county had notice of the pendency of the action and was given the opportunity to be heard, both at the dispositional hearing as well as at the earlier hearing.

At the hearing of 18 August 1980, the county argued that it ought not to be a party to the proceeding because "it has never filed a motion or petition and because there is no legal relationship between it and the child." While the factual basis of the county's argument is correct, to so argue, however, is to miss the point. The county had no responsibility to file a motion in the cause. Nor was the county privy to a legal relationship between itself and the child. The pertinent legal relationship was that between respondent and the Division of Youth Services to whom Scott's custody had been

In re Brownlee

committed for the unauthorized use of a motor vehicle. The extent of the county's actual interest in the present case arises from its potential liability for the expenditure of its tax revenues. As such, it had no legitimate interest in the commencement of the action. Instead, its interest is confined to the effect a final disposition of the cause will have upon its financial resources.

Even if the county had been a party, it would not have had the *right* to appeal from the orders in question. G.S. 7A-667 provides as follows:

> An appeal may be taken by the juvenile; the juvenile's parent, guardian, or custodian; the State or county agency. The State's appeal is limited to the following:
>
> (1) Any final order in cases other than delinquency or undisciplined cases;
>
> (2) The following orders in delinquency or undisciplined cases:
>
>> a. An order finding a State statute to be unconstitutional;
>>
>> b. Any order which terminates the prosecution of a petition by upholding the defense of double jeopardy, by holding that a cause of action is not stated under a statute, or by granting a motion to suppress.

It is manifest that the statute which is set out above does not empower a county to take an appeal in a juvenile proceeding. While it is true that the Wake County Department of Social Services was given custody of Scott and directed to make all of the necessary arrangements for his transfer to the Brown Schools, that portion of Judge Bason's order cannot be employed as a basis upon which to found a right of appeal under the applicable statute. It is clear that the terminology "county agency" could not have been intended to include the very entity which would create the agency in the first place.

We hold that Wake County did not have the right to appeal from the challenged orders. Nevertheless, this court is authorized to issue "any remedial writs necessary to give it general supervision

and control over the proceedings of the other courts" of the state. N.C. Constitution, Article IV, Section 12 (1). Under exceptional circumstances this court will exercise power under this section of the constitution in order to consider questions which are not presented according to our rules of procedure; *State v. Stanley,* 288 N.C. 19, 215 S.E.2d 589 (1975); and this court will not hesitate to exercise its general supervisory authority when necessary to promote the expeditious administration of justice. *Brice v. Robertson House Moving, Wrecking and Salvage Co.,* 249 N.C. 74, 105 S.E.2d 439 (1958); *Park Terrace, Inc., v. Phoenix Indemnity Co.,* 243 N.C. 595, 91 S.E.2d 584 (1956).

We consider the present case to be of such importance that the expeditious administration of justice requires us to invoke our supervisory authority. The novelty of the issues presented, coupled with the potential liability of the counties of North Carolina, serves to emphasize the proper role of the judiciary in securing a prompt resolution of this matter. While it is true that Wake County was not a *formal* party to the proceeding before Judge Bason, it does have a significant interest in the outcome of the matter in that its funds have already been expended pursuant to a court order and that its funds are potentially subject to further expenditures pursuant to the directive of the district court. In other words, the county has a cognizable interest in the determination of whether the action of the lower court was authorized by law. Therefore, we elect to treat the papers which have ben filed in this court as a motion calling upon the court to exercise its supervisory powers to enable it to review the orders entered by Judge Bason. The motion is allowed, and we will now proceed to examine the cause on its merits.

## THE VALIDITY OF THE ORDERS

[3] A careful study of the pertinent statutes leads us to conclude that Judge Bason did not have the authority to require Wake County to pay for Scott's treatment at the Brown Schools in Austin, Texas.

Judge Bason's order of 16 September 1980 states that he was sending Scott to "the Brown Schools for residential treatment pursuant to G.S. 7A-649(6)." G.S. 7A-649 lists ten "dispositional alternatives" that a district court judge has available to him in dealing with delinquent juveniles. G.S. 7A-649(6) provides that a judge may "[o]rder the juvenile to a community-based program of academic or vocational education or to a professional residential or non-residential treatment program. Participation in the programs shall not exceed 12 months". Obviously Judge Bason concluded that the

Brown Schools provide "a professional residential . . . treatment program".

G.S. 7A-647 provides district court judges with certain dispositional alternatives in dealing with delinquent, undisciplined, abused, neglected, or dependent juveniles. G.S. 7A-647(3) provides as follows:

> In any case, the judge may order that the juvenile be examined by a physician, psychiatrist, psychologist or other qualified expert as may be needed for the judge to determine the needs of the juvenile. If the judge finds the juvenile to be in need of medical, surgical, psychiatric, psychological or *other treatment,* he shall allow the parent or other responsible persons to arrange for care. If the parent declines or is unable to make necessary arrangements, the judge may order the needed treatment, surgery or care, and the judge may order the parent to pay the cost of such care pursuant to G.S. 7A-650. If the judge finds the parent is unable to pay the cost of care, *the judge may charge the cost to the county* . . . . (Emphasis added.)

Since our present Juvenile Code, G.S. 7A, Articles 41-54, was enacted by the 1979 General Assembly and became effective on 1 January 1980 (1979 N.C. Sess. Laws c. 815) the courts have had little opportunity to construe its provisions. It is fundamental that legislative intent controls the interpretation of statutes. *Housing Authority of the City of Greensboro v. Farabee,* 284 N.C. 242, 200 S.E.2d 12 (1973); *Person v. Garrett,* 280 N.C. 163, 184 S.E.2d 873 (1971). In seeking to ascertain and give effect to the legislative intent, an act must be considered as a whole. *State v. Harvey,* 281 N.C. 1, 187 S.E.2d 706 (1972). Statutes which deal with the same subject matter must be construed in *pari materia, e.g., Shaw v. Baxley,* 270 N.C. 740, 155 S.E.2d 256 (1967), and harmonized, if possible, to give effect to each. *E.g., Jackson v. Guilford County Board of Adjustment,* 275 N.C. 155, 166 S.E.2d 78 (1969).

The first section of our Juvenile Code, G.S. 7A-516, provides:

> This Article shall be interpreted and construed so as to implement the following purposes and policies:

> (1) To divert juvenile offenders from the juvenile system through the intake services authorized herein *so that juveniles may remain in their own homes and may be treated through community-based services when this ap-*

*proach is consistent with the protection of the public safety;*

(2) To provide procedures for the hearing of juvenile cases that assure fairness and equity and that protect the constitutional rights of juveniles and parents; and

(3) To develop a disposition in each juvenile case that reflects consideration of the facts, the needs and limitations of the child, the strengths and weaknesses of the family, and the protection of the public safety. (Emphasis added.)

While it is manifest that the express words of the statute which is set out above speak in terms of "this article", it would be inappropriate for us to be oblivious to the public policy objectives which prompted the adoption of the new Juvenile Code by the 1979 General Assembly and which the legislature attempted to articulate in the introductory provisions of the legislation. Prior to the adoption of the Juvenile Code, judges of the district courts who were sitting in juvenile matters had little flexibility in making suitable provision for youthful offenders. Other than committing a juvenile to a county or regional detention home when such was needed for the protection of the community or in the best interest of the child, *see* G.S. § 110-24 (1978), the judges of the state were empowered only to place juveniles on probation, the conditions and duration of which were to be set out in the appropriate order entered in the cause. *See* G.S. § 110-22 (1978).

In seeking to introduce greater flexibility in the juvenile justice system of the state, the General Assembly, we think, was echoing the sentiments of the Penal System Study Commission of the North Carolina Bar Association. In its report, *As the Twig Is Bent,* the Commission observed

Certainly there are young people within our society for whom confinement and rigid discipline may be necessary for both their protection and society's protection. The State must provide a system of dealing with youngsters who become delinquent for whatever reason. It must afford young people maximum opportunities to overcome their problems and to become adults well equipped to take their places in society. Our present system does not achieve this goal.

* * *

> We must establish a continuity of care that begins when
> the child is arrested and continues through and beyond
> his incarceration until all reasonable steps have been
> taken to assure his rehabilitation.

North Carolina Bar Association Penal System Study Commission,
*As the Twig Is Bent* 23 (1972); *compare* National Advisory Commit-
tee on Criminal Justice Standards and Goals, *Juvenile Justice and
Delinquency Prevention* 611-12 (1976).

While the term "community-based program" is a term of art,
*see* G.S. § 7A-517(8) (Cum. Supp. 1979), we feel that its usage by the
General Asembly reflects its concern that responses to the prob-
lems of the juveniles coming before the courts be fashioned in a
flexible manner so as to address the best interests of the child in
ways other than probation and commitment to training schools.
The same subsidiary concept at work in the introductory provisions
of the Juvenile Code permeates all of its subsequent provisions: The
relationship of family and friends is an important component in the
rehabilitative program for a youthful offender, and institutionali-
zation of a child ought not to be ordered except in an extraordinary
situation. Otherwise, the stabilizing and motivational attributes of
familiar surroundings is lost to the process.

Indeed, the General Assembly has provided in concrete terms
an expression of its concern in this regard by stating in G.S. §
7A-646 that

> The purpose of dispositions in juvenile actions is to
> design an appropriate plan to meet the needs of the juve-
> nile and to achieve the objectives of the State in exercis-
> ing jurisdiction. If possible, the initial approach should
> involve working with the juvenile and his family in their
> own home so that the appropriate community resources
> may be involved in care, supervision, and treatment
> according to the needs of the juvenile. Thus, the judge
> should arrange for appropriate community-level servi-
> ces to be provided to the juvenile and his family in order
> to strengthen the home situation.

> In choosing among statutorily permissible dispositions
> for a delinquent juvenile, the judge shall select the least
> restrictive disposition both in terms of kind and duration,
> that is appropriate to the seriousness of the offense, the

degree of culpability indicated by the circumstances of the particular case and the age and prior record of the juvenile. *A juvenile should not be committed to training school or to any other institution if he can be helped through community-level resources.* (Emphasis added.)

As we observed earlier, G.S. § 7A-649 provides ten specific alternatives from which the court is empowered to select what it feels to be the most appropriate disposition for a delinquent child. The wide variety and scope of the alternatives which are embodied in the statute's formulation of dispositional alternatives leads us to conclude that it was the legislature's intention that the district courts exercise sound discretion in fashioning an appropriate response to each particular instance of delinquency. The tenth alternative which is provided by the statute is clearly the most severe: commitment of the juvenile to the Division of Youth Services in accordance with the provisions of G.S. § 7A-652. This alternative is the most severe in that it makes no change in the former practice of committing juveniles to state training schools when it was concluded that conditional probation was inappropriate on the facts of the case. Clearly, that alternative ought to be employed only when there is no reasonable alternative open to the court in its disposition of the matter.

A close examination of the other nine alternatives provided by G.S. § 7A-649 indicates that all of them are subsumed within the concept of *community-level* services. It will be recalled that we earlier observed that *community-based* program is a term of art defined in the statute itself as being a residential or non-residential treatment program which serves a juvenile in the community in which he lives. Only G.S. § 7A-649(6) is in any way defined in terms of this term of art. Even then, its scope is limited to a program of academic or vocational education. Every other alternative provided by the statute, including the provision of G.S. § 7A-649(6) which authorizes commitment of a child to a professional residential or non-residential treatment program, can be employed in such a manner upon an appropriate court order that the concern of the Juvenile Code that the needs of an individual child be addressed in terms of programs which provide meaningful, *community-level* efforts which would serve to keep the child in familiar surroundings. It is apparent that such programs would be aided by the fact that a child's rehabilitation in such a program would be aided to a considerable degree by keeping the child among his family and

In re Brownlee

friends, or at the very least, having them within reasonably close proximity to the location where the care is being provided to the child in question.

G.S. § 7A-646 sets forth in clear terms the mandate of the General Assembly in providing for various dispositional alternatives for delinquent juveniles. The statute provides that

> . . . the initial approach should involve working with the juvenile and his family in their own home so that the appropriate community resources may be involved in the care, supervision and treatment according to the needs of the juvenile. Thus, the judge should arrange for appropriate community-level resources to be provided to the juvenile and his family in order to strengthen the home situation.
>
> * * *
>
> A juvenile should not be committed to training school or any other institution if he can be helped through community-level resources.

While it is true that one of the clear objectives of the juvenile justice system is to fashion a response to the problems of a child within its purview which addresses the particular needs of the child and is in the child's best interests as determined by the court, *see In re Vinson,* 298 N.C. 640, 260 S.E.2d 591 (1979); *compare State v. Burnett,* 179 N.C. 735, 102 S.E. 711 (1920), that determination cannot be in a vacuum. Indeed, in making its decision concerning the disposition of a juvenile, a court exercising its juvenile jurisdiction must also weigh the best interests of the state. *See In re Burrus,* 275 N.C. 517, 169 S.E.2d 879 (1969), *aff'd. sub. nom., McKeiver v. Pennsylvania,* 403 U.S. 528 (1971). What is or is not in the best interest of the child must be determined in tandem with the perception of the legislature as to what is in the best interest of the state as enunciated by the terms of the Juvenile Code and by its general theme as deduced from the impetus behind its enactment.

While G.S. § 7A-649 provides numerous alternatives to be employed in fashioning a suitable disposition for a juvenile delinquent, some of its provisions are not self-executing. It is conceivable that an appropriate disposition of a juvenile's case would require that resources other than those provided by governmental units be employed by the court. No doubt exists in our minds that the

General Assembly envisioned such a situation emerging. This conclusion is made clear upon examination of the provisions of G.S. § 7A-647. In that statute, the legislature directed that

> In any case, the judge may order that the juvenile be examined by a physician, psychiatrist, psychologist or other qualified expert as may be needed for the judge to determine the needs of the juvenile. If the judge finds the juvenile to be in need of medical, surgical, psychiatric, psychological, or other treatment, he shall allow the parent or other responsible persons to arrange for care. If the parent declines or is unable to make necessary arrangements, the judge may order the needed treatment, surgery, or care, and the judge may order the parent to pay the cost of such care .... If the judge finds that the parent is unable to pay the cost of care, the judge may charge the cost to the county.

It would seem, therefore, that the dispositional alternatives enumerated by G.S. § 7A-649 are to be read in tandem with this provision. If it were not for this grant of authority, it is possible that the alternatives provided to the courts would, in some instances, be empty and unworkable. However, in invoking the authority to charge the cost of care to the county, the courts must be sensitive not only to the proper placement of the child. The courts must also consider what is in the best interest of the state in the utilization of its resources and those of its inferior components.

Throughout the Juvenile Code, there is a consistent emphasis upon treating a child at the community level. We do not understand this emphasis to be taken in a literal fashion. To do so would be to foster an absurd result. It is manifest that not all areas in our state are privy to the same wealth and the resources which that wealth would make available within the confines of the *geographic* community. While we hasten to add that the best interests of the child will often be served by keeping the individual in his own home, subject to guidance and outpatient services of one kind or another, it need not necessarily be so.

Our decision today ought not to be taken to mean that judges may not remove a child from his neighborhood and hometown or county. That would not be a reasonable interpretation of the statute and the legislative intent. Instead, we feel that the term community

ought to be interpreted in a broad manner, connoting an interrelationship among persons who live in the same general area, but who also share the same laws, rights, and interests. *See Sacred Heart Academy of Galveston v. Karsch.* 173 Tenn. 618, 122 S.W.2d 416 (1938). In this regard, we find Judge Bason's order to be fatally defective. By making the detailed provisions of the Juvenile Code, with their repeated emphasis upon community-level services, we find it inconceivable that the General Assembly intended to vest the court with the authority to order a child committed to an out-of-state facility and charge the cost of the care so provided to the county.

We commend Judge Bason for his longstanding concern for the welfare of juveniles who come before him. The record in the present case reveals the patience that His Honor exercised in dealing with Scott over a period of many months and his tireless efforts to secure effective help for a delinquent and disturbed youth. Such patience and expenditure of effort is a salutary example to the judiciary of this state. However, we are unable to conclude that the General Assembly intended to vest him with the authority which he sought to exercise in this case. Hopefully, this case and others like it, will prompt our state to develop an effective means of dealing with children of Scott's nature and disposition.

For the reasons stated, the judgment of the District Court is

Reversed.

Justice CARLTON dissenting.

I respectfully dissent from the majority opinion. In interpreting the statutes enacted by our Legislature, it places form above substance, erroneously construes the dispositional provisions of our juvenile code, and produces a result which seriously curtails the ability of court officials to deal with emotionally disturbed children.

I disagree with the majority's repeated emphasis on and interpretation of the provisions of G.S. 7A-649 for two reasons.

First, it is obvious from the record that Judge Bason intended to commit the child under the authority of G.S. 7A-647(3), not G.S. 7A-649(6) as assumed by the majority. As developed more fully below, the former clearly authorizes Judge Bason's action. While the final order did recite that Scott was being sent to the Brown School pursuant to G.S. 7A-649(6), it also expressly stated that Wake Coun-

ty's responsibility to provide for the care was pursuant to G.S. 7A-647(3). Moreover, various findings and conclusions by the trial judge compel the conclusion that he was proceeding under the authority of G.S. 7A-647(3). For example, conclusion of law E. in the final order provided, "This court has the authority *to order the treatment Scott needs* and to charge that cost to Wake County *pursuant to G.S. 7A-647(3)*" (emphases added). For the majority to ignore all of this and simply conclude that the judge was proceeding solely under G.S. 7A-649(6) is, in my opinion, placing form above substance.

Secondly, assuming *arguendo* that Judge Bason was proceeding under the authority of G.S. 7A-646(6), I strongly disagree that this statute is presently limited to programs within the State of North Carolina. The statute provides that a judge may "[o]rder the juvenile to a community-based program of academic or vocational education *or to* a professional residential or non-residential treatment program." G.S. 7A-649(6) (Cum. Supp. 1979) (emphasis added). The "community-based" limitation is clearly intended to apply only to the academic or vocational education programs — programs normally available in many communities. The remainder of the sentence referring to professional programs is pointedly separated by the words "or to" and there is not even a hint that such programs must be located within the child's home community or the state. Indeed, such programs are available in relatively few communities in North Carolina and no community in the state has available the program prescribed for Scott. This was the finding of the trial court and is binding on this Court on appeal.

G.S. 7A-647(3), quoted in the majority opinion, clearly allows the trial judge to order psychiatric, psychological or other appropriate care for a child when he finds the child needs such care and to charge the costs to the county. This is what the statute provides, plainly and simply. There is absolutely nothing in the statute limiting the trial court to in-state placement for treatment of a disturbed child.

The majority has strained mightily to find some language in our juvenile code to support its result. In my opinion, it has failed to do so. After quoting, disjointedly, various sections of the code emphasizing the laudable goal of serving troubled children in surroundings most similar to their own communities when appropriate programs are available, the majority then concludes that,

"we find it inconceivable that the General Assembly intended to vest the court with the authority to order a child committed to an out-of-state facility and charge the cost . . . to the county." The majority cites no authority for such a conclusion, for there is none.

I find the reasoning of the majority both strained and inconsistent. For example:

(1) It speaks of the lack of flexibility provided by the former juvenile code in dispositional alternatives and interprets the present code to provide a more "flexible manner" for courts to fashion responses to the problems of juveniles, yet it denies that very flexibility in the matter before us.

(2) It acknowledges the clear intent of the code that juveniles be committed to training school only when no other "reasonable alternative" is available, yet it denies Scott Brownlee the only "reasonable alternative" the trial court could find for him after weeks of pleading with local and state agencies for help they were unable to provide.

(3) In holding that one of the clear purposes of the juvenile justice system is to serve the child's best interests, the majority holds that a dispositional "determination cannot be made in a vacuum." The majority states, "a court exercising its juvenile jurisdiction must also weigh the best interests of the state," yet the majority fails to point to any step in these proceedings at which the trial court was acting in a "vacuum" or at which the judge failed to consider the "best interests of the state." Indeed, the majority could make such statements only in the abstract because the record before us discloses that the trial court gave Wake County every conceivable opportunity to present an alternative solution and invited the county to fully participate in the proceedings. The assistant county attorney, at one stage of the proceedings, walked out of the courtroom. If any "vacuum" resulted, it was the fault of Wake County, not that of the trial court or of the child.

(4) The majority states that "[i]t is conceivable that an appropriate disposition . . . would require that resources other than those provided by governmental units be employed by the court. No doubt exists in our minds that the General Assembly envisioned such a situation emerging." The majority here denies such a resource to Scott Brownlee.

In re Brownlee

(5) The majority holds that G.S. 7A-649 must be read "in tandem" with G.S. 7A-647, yet it fails to apply the clear language of G.S. 7A-647(3) to the matter before us.

(6) The majority holds that when a juvenile judge invokes the authority to charge the cost of care to a county, the judge must be sensitive both to the proper placement for the child and consider the best interests of the state "in the utilization of its resources and those of its inferior components," yet it fails to note any failure of the trial court to consider the utilization of Wake County's resources. If the implication is that the approximate annual cost in excess of $40,000 for treatment at the Brown School is excessive, how does the majority rationalize such a conclusion with the finding quoted in the opinion that the average annual cost of treatment for an adolescent at Dorothea Dix Hospital in Raleigh is $65,000?

(7) The majority states that,"Our decision today ought not to be taken to mean that judges may not remove a child from his neighborhood and hometown or county. That would not be a reasonable interpretation of the statute and the legislative intent," yet it denies such removal of this child. Its only explanation for such a result is that the majority finds "inconceivable" a legislative intent to vest the trial court with authority for out-of-state placement at county expense.

The majority, in effect, has held that the juvenile code permits treatment of a child only in "community-based" facilities and that "community" is intended by the Legislature to encompass the entire state. That this could not have been the legislative intent is clear from the code itself. Throughout the code are references to treatment of the child within his own community, and full utilization of "community-level resources" is required before a juvenile can be committed to a *state* training school. Additionally, a *"community-based program"* is defined as "[a] program providing nonresidential or residential treatment to a juvenile in the community *where his family lives*." G.S. § 7A-517(8) (Cum. Supp. 1979) (emphasis added). "Community" was obviously intended by our Legislature to mean a much smaller geographic area than the entire state. And it is also obvious that the Legislature, although it intended that resources within the child's community *be utilized first*, did not intend district court judges to be limited to resources available within the child's community when fashioning the appropriate disposition for each child. Likewise, there is nowhere manifested in the juvenile code an intent that the available dispositional alterna-

tives be limited to facilities within the state.

This Court announces today that juvenile judges must exercise "sound discretion" in determining appropriate dispositions for juvenile delinquents, yet it cites no instance in which Judge Bason abused his discretion. Is it because the costs of this program are too excessive or the distance to Texas too far? Is it because the majority feels the program of treatment inappropriate for this child? Trial courts are given no guidelines for exercising their discretion. One can only conclude from the opinion that the majority feels that Judge Bason abused his discretion by placing Scott in a program beyond the borders of North Carolina. However, would the majority result have been any different had the same program at the same cost been available *within* our state but several hundred miles from Scott's home county? I realize, of course, that an appellate court cannot always answer questions which are not asked and must deal with the record before it. However, I fear that the majority opinion today will be confusing to our trial judges as they attempt to decide whether their dispositions for juveniles are based on "sound discretion."

I wish to make it clear that I do not advocate that juvenile judges be given the authority to send children all over the country for treatment wherever and whenever they wish. Obviously, there is a limit to the amount of public funds which can be expended for such purposes. Equally obvious, as the majority acknowledges, is that North Carolina must develop effective programs for such children. The Legislature must address this serious problem. In the meantime, however, Scott Brownlee should not be denied a program which is in his best interests and which the present juvenile code plainly allows, G.S. § 7A-647(3) (Cum. Supp. 1979). I do not think this Court should engage in judicial legislating.

The result of the decision of this Court today is to take Scott Brownlee from a program found to be in his best interest and to bring him back to Wake County to face an uncertain future. Perhaps that will not matter. Like the majority, I have no idea whether Scott has made any progress whatsoever. It may be that this young man's mind is so disturbed that no program anywhere in the world could prevent his graduation from juvenile delinquent to hardened criminal. It seems to me, however, that we ought not to give up on him in the middle of treatment and return him to a situation which offers little hope. The odds that he will soon be an adult criminal

In re Brownlee

will surely be greater if he is returned. Such a result, I might add, will be far more expensive to the public than the costs of his present program. With so much at stake, I simply cannot understand why a majority of this Court chooses to read words into our juvenile code which are not there.

During oral argument, one member of this Court stated that he could not conceive that our Legislature intended to give juvenile judges the authority to send children, at county expense, to such faraway places as Texas, Hawaii or England. I agree that not even the first member of our Legislature consciously considered that our emotionally disturbed children would be sent so far away. Such a conclusion on our part, however, should not result in the decision reached by the majority today. Rigid adherence to such a view has led a majority of this Court to usurp the legislative process. Moreover, our juvenile judges will find it far more difficult in the future to utilize novel and innovative programs for delinquent children.

Assuming the Legislature never contemplated the situation presented by the record before us, what should this Court do about it? The answer is, of course, that we should construe the statute according to its plain meaning and not attempt to divine what the Legislature would have intended had it considered this situation. We should affirm the action of the trial court because it was proper under the present code. The Legislature convenes in this city in less than three weeks and can, if it wishes, amend the statutes to more clearly reflect the legislative intent, whatever that may be. The public money spent during the interim would surely not be an unwise investment when compared to the harm this decision may cause to Scott Brownlee and to thousands of other young people in the future.

I vote to affirm.

Justice EXUM joins in this dissent.