16 F.3d 409
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 Roger HERNDON; Terri Whitehurst, formerly known as Terri W.
Bennett; Johnny James Jackson, Jr.; Yvette McRae
Outing; Donnie Hall, Plaintiffs-Appellants,
v.
ITT CONSUMER FINANCIAL CORPORATION, d/b/a Aetna Finance
Company, d/b/a ITT Financial Services, a Delaware
corporation; ITT Corporation, formerly known as
International Telephone and Telegraph Corporation; ITT
Consumer Services Corporation, a Delaware corporation; ITT
Financial Corporation, a Delaware corporation; Lyndon
Insurance Company, a Wisconsin corporation; ITT Lyndon Life
Insurance Company, a Missouri corporation; American Bankers
Life Assurance Company of Florida, a Florida corporation;
John Doe, I-VIII, Defendants-Appellees.
 No. 92-1663.
 United States Court of Appeals, Fourth Circuit.
 Dec. 8, 1993.
Jan. 26, 1994.
 
 Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Robert D. Potter, District Judge. (CA-90-314-C-C-P)
 Mark Reinhardt, Reinhardt & Anderson, St. Paul, Minnesota, for Appellants.
 Peter J. Covington, Smith, Helms, Mulliss & Moore, Charlotte, North Carolina, for Appellees.
 Sara Madsen, Reinhardt & Anderson, St. Paul, Minnesota; James L. Blane, Sanders, Millette & Blane, Charlotte, North Carolina, for Appellants.
 Irving M. Brenner, Smith, Helms, Mulliss & Moore, Charlotte, North Carolina, for ITT Appellees and Lyndonn Insurance.
 Everett J. Bowman, D. Blaine Sanders, Robinson, Bradshaw & Hinson, P.A., Charlotte, North Carolina, for Appellee American Bankers Life.
 W.D.N.C.
 Affirmed.
 Before HALL, LUTTIG, and MICHAEL, Circuit Judges.
 
 OPINION
 PER CURIAM
 
 1
 Five named plaintiffs brought this putative class action against a consumer finance company and others[1] under various state and federal statutes.[2] The essential premise of each claim is that the defendants violated state consumer laws by selling non-credit life and disability insurance in conjunction with the loans. The district court granted summary judgment to the defendants and dismissed the action. We affirm.
 
 
 2
 * In the late 1980s, each plaintiff obtained a small cash loan from Aetna. In addition to purchasing credit life, credit disability, and household contents insurance (to insure repayment of the loan in the event the borrower died or became disabled, or the security was destroyed), each borrower purchased non-credit term life and disability insurance. The purchase of this non-credit insurance was financed as part of the same loan. Aetna would issue a separate check in the amount of the non-credit insurance premiums and have the borrower endorse this check to American Bankers Life Assurance Company, the company that was issuing the insurance policies.[3]
 
 
 3
 In their motion for partial summary judgment, the plaintiffs asked the district court to declare that the sale of the non-credit policies violated the North Carolina Consumer Protection Act ("Act"). The defendants cross-moved for summary judgment. The district court granted the latter motion and dismissed the case with prejudice. The plaintiffs appeal.
 
 II
 
 4
 The Act, which became law in 1961, initially prohibited lenders from engaging in any business at their approved offices other than making small loans.
 
 
 5
 Sec. 53-172. Conduct of other business in same office. No licensee subject to the provisions of this article shall conduct its business as a licensee in an office, or annex to an office, or any other business, but shall maintain an office in which only its business as a licensee shall be conducted.
 
 
 6
 N.C. Sess. Laws 1961, c. 1053, s. 1. In 1971, the Act was amended to allow the Commissioner of Banks to permit such lenders to conduct "other business" on the same premises.
 
 
 7
 Sec. 53-172. Conduct of other business in same office. No licensee shall conduct the business of making loans under this Article within any office, suite, room, or place of business in which any other business is solicited or engaged in unless, in the opinion of the Commissioner, such other business would not be contrary to the best interests of the borrowing public and is authorized by the Commissioner in writing.
 
 
 8
 If the conduct of any other business authorized by the Commissioner should, in the opinion of the Commissioner, prove contrary to the best interests of the borrowing public, the authority granted to conduct such business shall be withdrawn in writing by the Commissioner.
 
 
 9
 N.C. Sess. Laws 1971, c. 1212. Aetna and several other small lenders obtained written permission from the Commissioner to sell credit life and fire insurance at their loan offices. In 1982, Aetna requested permission to sell the non-credit life insurance policy that was later sold to the plaintiffs. This request was also approved, and, in 1984, permission to sell the non-credit disability policy was given.
 
 
 10
 In 1990, a few years after the plaintiffs had bought their policies, the Commissioner of Banks, William Graham, wrote to all the consumer finance licensees who had been authorized to sell non-credit insurance under the "other business" umbrella and informed them that he (and his predecessors) may have been wrong in their interpretation of the law as allowing the Commissioner to authorize the sale of the non-credit products.[4] A few months later, he wrote again to say he was still studying the question with an eye to asking the state Attorney General for his opinion. He added that, in the event that the Attorney General were to opine that the Commissioner's office had no authority to permit the sale of the non-credit insurance, he would give the state legislature a chance to correct the problem before acting. The Commissioner of Insurance sent out a legal directive dated May 3, 1990, stating that credit insurance was the only kind of insurance that could be sold in connection with loans made under the Act. The plaintiffs filed their complaint on October 2, 1990.
 
 
 11
 In January 1991, the state Attorney General issued his opinion that N.C. Gen.Stat. Sec. 53-172 does permit the Commissioner of Banks to authorize a consumer finance licensee to engage in"other business" on the same premises as its loan operations. However, the Attorney General added that another section of the Act, N.C. Gen.Stat. Sec. 53-178,
 
 
 12
 prohibits licensees under the Consumer Finance Act from benefitting from any charges or insurance commissions realized from the sale of any services, products, or insurance made as part of or in connection with a loan transaction under the Act other than those specified in the Act, whether benefit is realized either directly by the licensee, or indirectly by any affiliate or associate of the licensee, or, in the case of corporate licensees, by an subsidiary or parent of the licensee.
 
 
 13
 Section 53-178, which had not been amended since the enactment of the Act in 1961, provided in relevant part: No further or other charges or insurance commissions shall be directly or indirectly contracted for or received by any licensee except those specifically authorized by this Article. No licensee shall divide into separate parts any contract made for the purpose of or with the effect of obtaining charges in excess of those authorized by this Article. All balances due to a licensee from any person as a borrower or as an endorser, guarantor or surety for any borrower or otherwise, or due from any husband or wife, jointly or severally, shall be considered a part of any loan being made by a licensee to such person for the purpose of computing interest or charges.
 
 
 14
 In other words, inasmuch as the sale of non-credit insurance policies is not "specified in the Act," licensed lenders can sell non-credit insurance if so authorized by the Commissioner, but they cannot make any money doing so.
 
 
 15
 Effective August 1, 1991, the Commissioner of Banks revoked all licensees' authority to sell non-credit insurance, but he stated that he would not seek any penalties from those who had sold the non-credit insurance in reliance on the past authorizations. Plaintiffs filed their summary judgment motion on October 9, 1991.
 
 
 16
 Characterizing the Attorney General's conclusion as"incomprehensible," the district court deferred to the long-standing interpretation of the banking commissioners and held that the for-profit sale of the non-credit insurance was not "per se illegal." We agree with the district court's analysis and conclusion.
 
 III
 
 17
 Our task is identical to that faced by the district court--we must predict whether the North Carolina courts would uphold the legality of the for-profit sales of non-credit insurance policies. See Wilson v. Ford Motor Co., 656 F.2d 960 (4th Cir.1981) (per curiam). Our review of the district court's determination of this state law issue is de novo. Salve Regina College v. Russell, 111 S.Ct. 1217 (1991). The parties' weapons of choice in this battle are the many and varied rules of statutory interpretation.
 
 
 18
 The thrust of the plaintiffs' argument is that Sec. 53-178 is unambiguous--"No further or other charges or insurance commissions shall be directly or indirectly contracted for or received by any licensee except those specifically authorized by this Article." (emphasis added)--and, therefore, no recourse to other sources of interpretation is necessary and no deference to administrative interpretation is due. Specific authorization is given in the Act for the following charges only: interest [Secs. 53-173, -176], fees for returned checks [Sec. 53-175], certain recording fees [Sec. 53-177], and commissions on the sales of credit life, credit disability, and credit property insurance [Sec. 53-189(b) ]. In short, the appellants' argument is that the 1971 "other business" amendment to Sec. 53-172 did not trump the explicit "no other charges" limitation in Sec. 53-178.
 
 
 19
 The primary rule of statutory construction is that the intent of the legislature controls, but "[w]here the language of a statute is clear and unambiguous judicial construction is not necessary." Colonial Pipe-line Co. v. Clayton, 166 S.E.2d 671, 679 (N.C.1969). The appellants' argument depends in large part on the consideration of Sec. 53-178 in isolation, but we are required to interpret any particular section in the context of the Act as a whole. See In re Brownlee, 272 S.E.2d 861, 871 (N.C.1981). Viewed in the setting of the Act, Sec. 53-178 is not nearly as unequivocal as the appellants contend. For example, it is at least plausible that the authorization to conduct "other business" implies the authorization to realize a profit for the services provided or the products sold. Once ambiguity slips in and the inquiry turns to extra-statutory sources of legislative intent, the appellants' argument becomes an increasingly difficult one to accept.
 
 
 20
 In 1992, Sec. 53-178 was amended to permit licensees to receive "other charges or insurance commissions ... specifically authorized by [the Act] or by the Commissioner under G.S. Sec. 53-172." (emphasis added). N.C. Sess. Laws 1991 (Reg. Sess., 1992), c. 765, s. 2. The amending legislation is entitled "An act to clarify and further regulate other business authority under the North Carolina Consumer Finance Act." North Carolina courts construe such titles as indicative of a legislative intent to clarify rather than change existing law. State ex rel. Cobey v. Simpson, 423 S.E.2d 759, 763-64 (N.C.1992). Such clarifying language is applicable to interpretation of the statute both before and after the effective date of the clarifying amendment. See N.C. Electric Membership Corp. v. N.C. Dept. of Economic and Community Development, 425 S.E.2d 440, 445-46 (N.C.1993) (deeming an amendment to be clarifying, and holding that the amendment would apply to interpretations of the pre-amendment version of the statute). The legislative intent behind the 1992 amendment of Sec. 53-178 is unmistakable--the authority to approve "other business" includes the authority to allow the loan companies to benefit from such other businesses.
 
 
 21
 Our construction of the Act is buttressed by nearly twenty years of consistent interpretation by the Commissioner of Banks. Though not controlling, " '[t]he construction placed upon a statute by the officers whose duty it is to execute it is entitled to great consideration, especially if such construction ... has been observed and acted upon for many years....' " State ex rel. Utilities Commission v. The Public Staff, 306 S.E.2d 435, 444 (N.C.1983) (quoting Gill v. Commissioners, 76 S.E. 203, 208 (N.C.1912)). Affidavits from the current Commissioner and a former Chief Counsel to the Commissioner, submitted in support of the defendants' motion for summary judgment, demonstrate that Sec. 53-172 was consistently interpreted as allowing the sale of non-credit insurance for profit. We believe that the North Carolina courts would interpret the Act in a manner consistent with the longstanding practice of the executive branch and with the 1992 clarification of the legislative branch.
 
 AFFIRMED
 
 
 [1]
 Aetna Finance Company is a corporation licensed to make small loans in North Carolina. The other defendants are parent companies of Aetna, insurance companies with which Aetna or its parents dealt, and officers of the corporate defendants
 
 
 [2]
 North Carolina Consumer Finance Act, N.C. Gen.Stat. Sec. 53-164 et seq., North Carolina Unfair Trade Practices Act, N.C. Gen.Stat. Sec. 75-1.1, Truth in Lending Act, 15 U.S.C. Sec. 1601 et seq., and Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. Sec. 1961 et seq
 
 
 [3]
 For instance, plaintiff Herndon borrowed $2565 in cash. He also purchased credit life [$201], credit disability [$252], and household contents [$227] insurance, for a total of $680, and non-credit life [$178] and disability [$188] policies, for a total of $366. The cost of all of these policies (plus a $5 recording fee) was borrowed, so the total amount financed was $3616. The total of payments was $5040, which included $1424 in finance charges
 
 
 [4]
 Aetna stopped selling the non-credit insurance as soon as it received this letter