IN THE MATTER OF WILLIAM DOE[1]

No. 434PA88

(Filed 5 September 1991)

1. **Infants § 20 (NCI3d)— juvenile delinquent—requirement of specific sexual offender treatment—insufficient treatment—denial of conditional release—authority of district court**

    The district court had statutory authority to order the Division of Youth Services to give specific sexual offender treatment to a juvenile found delinquent because of sex offenses when such treatment was available. The district court also had statutory authority to deny the conditional release of the juvenile as requested by the Division of Youth Services because the juvenile had not received sufficient treatment to predict success of the juvenile or safety of the community and to order necessary psychological treatment through a community-based program simultaneously with the juvenile's continued commitment.

    **Am Jur 2d, Juvenile Courts and Delinquent and Dependent Children §§ 16, 33.**

2. **Constitutional Law § 12 (NCI4th)— Separation of Powers Clause—order within court's inherent power**

    There is no violation of the Separation of Powers Clause of the North Carolina Constitution when a court issues an order within its inherent power to do what is reasonably necessary within the scope of its constitutional and statutory jurisdiction. N. C. Const. art. I, § 4.

    **Am Jur 2d, Constitutional Law § 307.**

3. **Constitutional Law § 12 (NCI4th); Infants § 20 (NCI3d)— juvenile commitment—order of sexual offender treatment—denial of conditional release—no violation of Separation of Powers Clause**

    There was no violation of the Separation of Powers Clause of the North Carolina Constitution when the district court, exercising its exclusive original jurisdiction, issued an order

---

1. In compliance with the confidentiality requirements of N.C.G.S. § 7A-675(g), the caption and all references to the juvenile avoid revealing his true name.

**IN RE DOE**

[329 N.C. 743 (1991)]

for a juvenile's commitment to the Division of Youth Services which included the dispositional directive that the juvenile be given sexual offender treatment, and issued a subsequent order denying the juvenile's conditional release as requested by the Division of Youth Services because he had not been given such treatment.

**Am Jur 2d, Constitutional Law § 307; Juvenile Courts and Delinquent and Dependent Children §§ 16, 33.**

4. **State § 4.2 (NCI3d); Infants § 20 (NCI3d) — juvenile delinquent — denial of DYS request for conditional release — no violation of sovereign immunity doctrine**

The district court's order denying a juvenile's conditional release as requested by the Division of Youth Services because the juvenile had not been given sexual offender treatment as mandated by the commitment order did not violate the doctrine of sovereign immunity.

**Am Jur 2d, Juvenile Court and Delinquent and Dependent Children § 33.**

ON writ of certiorari to review an order entered by *Titus, J.,* on 19 July 1988 in District Court, DURHAM County, prior to determination by the North Carolina Court of Appeals. Heard in the Supreme Court 15 February 1990.

*Lacy H. Thornburg, Attorney General, by Doris J. Holton, Assistant Attorney General, and Jeffrey R. Ellinger, for the State-appellee.*

*Lacy H. Thornburg, Attorney General, by John R. Corne, Assistant Attorney General, for appellant Division of Youth Services, Department of Human Resources.*

EXUM, Chief Justice.

In this case we consider the judiciary's power to order the Department of Human Resources, Division of Youth Services (DYS) to give sex offender treatment to an adolescent found delinquent because of sex offenses and subsequently to deny the conditional release of that adolescent because treatment had not been in compliance with that mandate. We conclude that both orders were within the court's statutory authority.

## IN RE DOE

[329 N.C. 743 (1991)]

I.

On 9 November 1987, the District Court in Durham County issued a Juvenile Disposition and Commitment Order, which stated the court's findings that the juvenile, fifteen, had "unlawfully, wilfully and feloniously commit[ted] the abominable and detestable crime against nature" with his eight-year-old sister, that he had "engaged in a repeated pattern of sexually assaultive behavior over the past several years," that he had been "previously hospitalized and [had] received out-patient counseling for these problems," and that this sexually assaultive conduct had been repeated shortly after discharge from the out-patient program, "indicating previous therapy [had been] ineffective." The court found in addition that the juvenile was at that time "a danger to himself and the community" and would continue to be such "unless appropriate treatment" was provided, and that, because of the seriousness of the offense and the continued pattern of sexually assaultive behavior and consequent need for secure residential treatment, there was no community-based alternative to commitment. The court ordered that:

> [the juvenile] be committed to the Department of Human Resources, Youth Services, for an indefinite period of time; that he shall not be released prior to receiving therapy for sexual offenders; that this placement be reviewed in 90 days; that he remain in the Durham County Youth Home until transported to the appropriate school.

On 7 June 1988, the same court, stating it had become aware that DYS intended the imminent release of William from its custody, issued an *ex parte* order. The order provided that "[the juvenile] not be released from the custody of [DYS] pending a hearing to determine the appropriateness of his return to the community."[2]

---

2. The order's text included remarks that its conclusion was based upon the following observations:

> "It appearing to the Court that previously attempted psychiatric hospitalizations have not effectively altered the juvenile's sexually assaultive behavior, and that treatment for sexual offenders for the juvenile is absolutely necessary to prevent the juvenile from being a danger to the community; and

> "It appearing to the Court that the commitment order dated November 9, 1987 mandated therapy for sexual offenders based upon a repetitive pattern of sexually assaultive behavior; and

> "It not having been demonstrated that any treatment specifically designed for sexual offenders has been undertaken as required by said order."

## IN RE DOE

[329 N.C. 743 (1991)]

On 8 July 1988 the Chief of Juvenile Support Services filed a Motion for Review, detailing reasons why the juvenile should be released from DYS custody. These included averments that William had participated and made "great progress" in a "specific, intensive," individual treatment program for his problem; that he "had made considerable progress" in the school's "mainstreaming" program (whereby through good conduct students earn points towards achieving a status making them eligible for release); and he had successfully participated in a vocational rehabilitation program. The motion noted that "the Division has provided William . . . with all the programs and services available in training school consistent with his needs," and that funding to expand services for juvenile sex offenders had been requested and denied by the legislature during its 1988 session.

In the hearing that followed on 19 July 1988, the court heard the testimony from, among others, Michael O'Toole, the psychologist who had counseled William during his period of commitment at the Stonewall Jackson School, and from Dr. Richard Rumer, a clinical psychologist at Duke Medical Center, who had evaluated William on 28 October 1987, shortly before his commitment, and again on 18 May 1988, in anticipation of his release.

The court's written order noted the positive testimony of O'Toole in finding William had successfully completed the school's "mainstreaming" program, and it found William had received individual therapy at Stonewall Jackson for aggressive sexual behavior. More notable, however, were the court's findings of fact based on the testimony of Dr. Rumer, who concluded from his May evaluation of William that there was a moderate risk William's sexually aggressive behavior would recur. The court restated Dr. Rumer's recommendation that William participate in a community treatment program for sexual offenders, but that this was not an appropriate alternative unless there were a "secure backup in the event of failure or lack of cooperation by the juvenile."

The court also noted it had never been informed by DYS pursuant to N.C.G.S. § 7A-665, that the agency was unable to provide services required by the commitment order—to wit, "treatment for sexual offenders prior to release and review of the placement," and requesting alternative disposition. Citing its statutory authority under N.C.G.S. § 7A-652(g) for retaining jurisdiction over the juvenile, the court denied the conditional release of William.

## IN RE DOE

[329 N.C. 743 (1991)]

The court's verbal order at the hearing's close stated more clearly that its intention in its initial commitment order had "not [been] . . . to require[ ] DYS to set up the program which I know they have not gotten the funds for. . . . My request was that he be provided treatment for sexual offenders. That can be through individual consultation." The court added that N.C.G.S. § 7A-647(3) "allows, and even requires a judge . . . in any case to order examination by an expert to determine the needs of the child. And if they found the needs of the child require psychiatric or psychological treatment, to order that."[3]

The court also clarified its rationale for denying William's conditional release from training school: First, the court had "never received any notification or request for modification that [appropriate] treatment [for sexual offenders] was not available and could not be available." Second, the court recognized its "statutory obligation . . . and the purpose behind the Juvenile Code . . . to develop a disposition in each juvenile case that reflects consideration of the facts," as well as its statutory mandate to protect the public. The court referred specifically to Dr. Rumer's testimony concerning William's potential for recidivism.[4] Moreover, the court did not find "the mainstream program to have been appropriate in William's case" because the "target population" of very young boys, whom William had formerly abused while baby-sitting, was not present at the training school.[5] Third, Dr. Rumer's testimony supported the court's observation that "there are community resources that are available now which were never available before."[6]

---

3. The court acknowledged that, because William was in training school, it could not require his parents to comply with its order to provide specific, sexual offender treatment; it therefore directed its order at DYS, as "another responsible person, to provide what . . . is recognized as absolutely necessary for William to prevent recidivism." See N.C.G.S. § 7A-647(3) (1989).

4. Dr. Rumer testified William "had made gains in treatment, but that treatment was not complete," and he expressed his concern about William's "moderate risk for reoffending."

5. Dr. Rumer testified: "From my understanding of the situation at Stonewall Jackson [S]chool, [William] had not had much access to much younger children. So the kind of acid test of how he does around much younger children and not in a highly structured situation has not occurred yet."

6. The court commented that it served on the board of the Community Based Alternative Fund and thus knew about a grant to establish an out-patient program for sexual offenders. The program would be run by Dr. Rumer, who testified at the hearing that William was a candidate for the program. The only stated

At the hearing's close, the court summarized what its intentions had been in its initial commitment order and in its *ex parte* order:

> [T]he Court does not find the mainstream program to have been appropriate in William's case. The problems were specifically addressed by the Court in the original order. I never heard that he could not get what was recommended by the Court, and I do not now believe that he has received what was recommended by the Court.
>
> I'm not saying set up a specific program, but I am saying do some things to help William a little further.

Following denial of its motion for review seeking William's conditional release, DYS petitioned the Court of Appeals for a writ of certiorari to review the court's orders. The writ was denied. This Court allowed DYS's subsequent petition for a writ of certiorari and ordered bypass of the Court of Appeals to review the trial court's order of 19 July 1988.

## II.

[1]    DYS first contends that the district court lacked subject matter jurisdiction and exceeded its statutory authority in its 19 July 1988 order, which DYS understood to require a specific type of therapy as a condition of William's release.

The North Carolina Juvenile Code patently provides for jurisdiction to lie exclusively in the district court between the stages of allegation and the final release of a juvenile. The district court has "exclusive, original jurisdiction over any case involving a juvenile who is alleged to be delinquent, undisciplined, abused, neglected, or dependent," N.C.G.S. § 7A-523 (1989), and the court retains jurisdiction over such a juvenile "until terminated by order of the court or until he reaches his eighteenth birthday." N.C.G.S. § 7A-524 (1989).[7] "Commitment of a juvenile to the Division of Youth Serv-

---

impediment to William's participation was Dr. Rumer's concern that there be the ability for "rapid access back to secured custody," an improbability unless William were to break the law, according to the court, because of delays caused by district court scheduling.

7. William turned eighteen on 18 August 1990. At that age the Juvenile Court no longer has jurisdiction, *see* N.C.G.S. § 7A-524 (1989), and a final release from DYS custody is available. Our decision in this case as applied to William is therefore

IN RE DOE

[329 N.C. 743 (1991)]

ices does not terminate the court's continuing jurisdiction rights over the juvenile . . . . Commitment of a juvenile to the Division of Youth Services transfers only physical custody of the juvenile to the Division." N.C.G.S. § 7A-652(g) (1989).

Although the Code authorizes the Director of DYS to decide whether conditional release or final discharge is appropriate, N.C.G.S. § 7A-655 (1989), and to initiate prerelease planning, N.C.G.S. § 7A-654 (1989), the court's jurisdiction is ongoing. The Director is required to notify the judge who ordered commitment about prerelease plans, N.C.G.S. § 7A-654(1) (1989), and to provide the court with a copy of the terms of the juvenile's conditional release. N.C.G.S. § 7A-655(1) (1989). The court's jurisdiction terminates only by its own order or by the juvenile's reaching the age of eighteen. , See N.C.G.S. § 7A-524 (1989). "[A] juvenile who is on conditional release and under the aftercare supervision of the court counselor" also remains under the court's jurisdiction, and the court may conduct "[p]roceedings to determine whether [the] juvenile . . . has violated the terms of his conditional release established by the Division of Youth Services." N.C.G.S. § 7A-523(a)(2) (1989).

The Juvenile Code mandates that, in the court's exercise of its exclusive jurisdiction over a juvenile determined to be delinquent, "the judge shall select the least restrictive disposition both in terms of kind and duration, that is appropriate to the seriousness of the offense, the degree of culpability indicated by the circumstances of the particular case and the age and prior record of the juvenile." N.C.G.S. § 7A-646 (1989). The judge is free, however, to choose among dispositional alternatives for a delinquent juvenile, and to "combine applicable alternatives when he finds such disposition to be in the best interest of the juvenile." N.C.G.S. § 7A-647. See also In re Groves, 93 N.C. App. 34, 37, 376 S.E.2d 481, 483 (1989). Flexibility in determining dispositions was one of the aims of the General Assembly in drafting the Juvenile Code. See In re Brownlee, 301 N.C. 532, 550, 272 S.E.2d 861, 872 (1981). These statutory dispositional alternatives include committing the juvenile to DYS, N.C.G.S. § 7A-649(10) (1989); but the court is not thereby deprived of jurisdiction and of exercising its discretion in determining dispositional alternatives. See N.C.G.S. §§ 7A-524, -647 (1989). The court may,

---

moot; however, the issues in this case concern the relative scope of statutory authority of the district court and the DYS, a controversy that is likely to recur. See In re Swindell, 326 N.C. 473, 474-75, 390 S.E.2d 134, 135 (1990).

for example, "suspend imposition of a more severe, statutorily permissible disposition," N.C.G.S. § 7A-649(1), such as commitment to DYS custody, and order a conditional release from commitment, or "order the juvenile to a community-based program . . . or to a professional treatment program." N.C.G.S. § 7A-649(6) (1989).

The judge who "finds the juvenile to be in need of . . . psychiatric [or] psychological . . . treatment [may] allow the parent or other responsible persons to arrange for care." N.C.G.S. § 7A-647(3) (1989). But where the parent declines or is unable to make such arrangements, "the judge may order the needed treatment." N.C.G.S. § 7A-647(3) (1989). Given the straightforward intent expressed in the Juvenile Code that the committing court retain jurisdiction over a juvenile, a common-sense reading of this provision is that it authorizes the district court to permit the DYS, as the "person" responsible for a juvenile in its custody, to arrange for psychological counseling for sexual offenders. When the agency, as custodian, fails to make such arrangements, the court is authorized by statute to "order the needed treatment." The onus is clearly on the DYS to alert the court whenever it finds "that any juvenile committed to [its] care is not suitable for its program." N.C.G.S. § 7A-665 (1989). Under such circumstances, the Director "may make a motion in the cause so that the judge may make an alternative disposition." N.C.G.S.·§ 7A-665 (1989).

This Court has held that the statutory authority of district courts does not extend so far as "to order the state, through the Division of Youth Services, to develop and implement specific treatment programs and facilities for juveniles." *In re Swindell*, 326 N.C. at 475, 390 S.E.2d at 136. *See also In re Wharton*, 305 N.C. 565, 573, 290 S.E.2d 688, 693 (1982). The Court of Appeals has similarly held that, even though the district court's order "carefully, and quite properly, avoided dictating any specific program for [the delinquent juvenile], [when] the record indicate[d] that no suitable program existed[,] . . . the order's practical effect was to require creation of a new program and a resultant reallocation of school resources." *In re Jackson*, 84 N.C. App. 167, 173, 352 S.E.2d 449, 453-54 (1982).

The case before us is different on its facts. The court's initial commitment order did not reflect in its findings of fact that programs for juvenile sexual offenders did not exist. Nor did the court order that such programs be developed or implemented. To

the contrary, it noted that William had been treated specifically for his sexually assaultive behavior in both in-patient and out-patient programs. Because William's pattern of sexual abuse, including his abuse of his sister, had occurred shortly after discharge from hospitalization, the court concluded that neither program had been effective either in remedying William's problem or in protecting the community from him. Consequently, in accordance with N.C.G.S. § 7A-652(a), the court ordered commitment as well as further therapy for sexual offenders.

The district court's order of 19 July 1988 was similarly within its statutory authority. The district court found that, despite individual counseling and the successful completion of the mainstream program at the training school, William had "not received sufficient treatment to predict success of the juvenile or safety to the community," were he to be conditionally released. The court found in addition that a community-based alternative treatment program, which had been recommended for William by Dr. Rumer, would not be available to William "without a secure backup in the event of failure or lack of cooperation by the juvenile." We hold the district court was authorized continually to oversee DYS's plans for William's release and that it exercised its oversight within the bounds of its authorization. Rather than accept at face value DYS's appraisal based upon William's successful participation in irrelevant DYS programs and his partial progress in overcoming his sexual abuse problem, the court, in accord with the Juvenile Code's purpose and directives, assessed the juvenile's remaining needs and the importance of protecting the community as its basis for disapproving William's conditional release. *See* N.C.G.S. § 7A-516(3), -652(g) (1989). Further, we hold the court was authorized by law to devise alternative dispositions for such delinquent juveniles, including ordering necessary psychological treatment through an established community-based program simultaneous with William's continued commitment. *See generally* N.C.G.S. §§ 7A-647, -649 (1989).

### III.

DYS next argues that in denying William's conditional release and in directing DYS to provide a specific type of therapy, the district court's order of 19 July 1988 violated the Separation of Powers Clause of the Constitution of North Carolina. This provides: "The legislative, executive, and supreme judicial powers of the

State government shall be forever separate and distinct from each other." N.C. Const. art. I, § 4.

By virtue of being one of three, separate, coordinate branches of the government, the courts have the inherent power and authority to do what is reasonably necessary for the proper administration of justice within the scope of their jurisdiction. *In re Court Facilities*, 329 N.C. 84, 94, 405 S.E.2d 125, 129 (1991); *Commonwealth ex rel. Carroll v. Tate*, 442 Pa. 45, 54, n.\*\*\*, 274 A.2d 193, 198 n.9, *cert. denied, Tate v. Pennsylvania ex rel. Jamieson*, 402 U.S. 974, 29 L. Ed. 2d 138 (1971). We have already noted that the jurisdiction of the court extends over a juvenile determined to be delinquent until terminated by the court's own order or by the juvenile's reaching the age of eighteen. *See* N.C.G.S. § 7A-524 (1989). We have held here that ordering DYS to provide specific treatment for sexual offenders for such a juvenile in its custody, when such treatment is available, is within the scope of the court's statutory authority. The question whether the order violated the Separation of Powers Clause, however, requires a view of what this provision means in light of the Constitution as a whole and the statutes pertinent to this case passed under its aegis.

This Court recently observed that "[t]he perception of the separation of the three branches of government as inviolable . . . is an ideal not only unattainable but undesirable. An overlap of powers constitutes a check and preserves the tripartite balance." *In re Court Facilities*, 329 N.C. at 96, 405 S.E.2d at 131. The North Carolina Constitution itself includes provisions in which the powers of the branches overlap. *See* N.C. Const. art. IV §§ 7-10, 12, 15, 17. *See also In re Court Facilities*, 329 N.C. at 95, 405 S.E.2d at 130. "No less important to a functional balance of power is the notion of a working reciprocity and cooperativeness amongst the branches." *Id.* at 97, 405 S.E.2d at 131. A court must wield its inherent power and exercise its statutory authority judiciously. *See id.* at 100, 405 S.E.2d at 133. It "must proceed with a cautious and cooperative spirit into those areas where its constitutional powers overlap with those of other branches." *Id.* When there is overlap, a court in exercising its constitutional powers must, "in the interests of the future harmony of the branches, . . . minimize the encroachment" upon the other branch in appearance and in fact. *Id.* at 101, 405 S.E.2d at 133. The court's reach into the public fisc, for example, even when authorized by statute, must reflect self-restraint and consideration of the entire fabric of the Code

**IN RE DOE**

[329 N.C. 743 (1991)]

and of community resources. For example, "in invoking the authority [of N.C.G.S. § 7A-647 and -649] to charge the cost of care to the county, the courts must be sensitive not only to the proper placement of the child. The courts must also consider what is in the best interest of the state in the utilization of its resources and those of its inferior components." *In re Brownlee*, 301 N.C. at 554, 272 S.E.2d at 874. *See generally In re Swindell*, 326 N.C. 473, 390 S.E.2d 134; *In re Wharton*, 305 N.C. 565, 290 S.E.2d 688; *In re Jackson*, 84 N.C. App. 167, 352 S.E.2d 449.

The principle of cooperation is of critical importance in assessing a challenge to government action like that before us based upon the Separation of Powers Clause. Necessary, functional overlap of two of the three separate, coordinate branches of government has been drafted directly into the Juvenile Code by the third, the legislative branch. The Code combines and coordinates the custodial and administrative role of DYS as an executive agency with the continuing jurisdiction and supervisory role of the district court. *See, e.g.*, N.C.G.S. §§ 7A-654, -655 (1989) (requiring written notification of prerelease planning and conditional release decision to committing court); N.C.G.S. § 7A-530 (1989) (mandating establishment of intake services by the Chief Court Counselor, "under the direction of the Administrator of Juvenile Services, . . . to determine whether facts alleged constitute a delinquent . . . offense within the jurisdiction of the court."); *compare* N.C.G.S. § 7A-649(1) (1989) (authorizing court conditionally to suspend imposition of more severe disposition) *with* N.C.G.S. §§ 7A-654 through -655 (conditional release process by DYS with notice to court).

A challenge by DYS, an executive agency, to the district court because of a perceived violation of the Separation of Powers Clause is particularly misplaced in this instance, where the governing statutes themselves dictate that the branches work together. Such coordination of the efforts of each branch must be in a "spirit of mutual cooperation" for the rehabilitation of the delinquent juvenile and for the protection of the community. *See In re Court Facilities*, 329 N.C. at 99, 405 S.E.2d at 132 (quoting *O'Coins, Inc. v. Treasurer of County of Worcester*, 362 Mass. 507, 515, 287 N.E.2d 608, 615 (1972) ). This Court has noted that the Juvenile Code reflects the General Assembly's aim not only "to introduce greater flexibility in the juvenile system of the state," but also to "establish a continuity of care that begins when the child is arrested and continues through and beyond his incarceration until all reasonable steps

have been taken to assure his rehabilitation." *In re Brownlee*, 301 N.C. at 550-51, 272 S.E.2d at 872 (quoting *As the Twig Is Bent*, report of the Penal System Study Commission of the North Carolina Bar Association). "[C]hecks and balances and functional differentiation can be evaluated on the basis of how effectively they contribute to the operational goals [of each branch]." *In Re Court Facilities*, 329 N.C. at 97, 405 S.E.2d at 131 (quoting C. Barr, *Separate But Subservient—Court Budgeting in the American States* (1975) ). Given the structure of the Code, which interweaves the responsibilities of each branch in seeking common ends, overnice concerns about the separation of powers as a question of a precise division of labor are bootless.

[2, 3]　We hold that there is no violation of the Separation of Powers Clause of the North Carolina Constitution when a court issues an order within its inherent power to do what is reasonably necessary within the scope of its constitutional and statutory jurisdiction. And we hold that there was no violation of the Separation of Powers Clause of the North Carolina Constitution when the district court, exercising its exclusive, original jurisdiction, issued the order for William's commitment and the order denying William's conditional release as requested by DYS, both of which included dispositional directives regarding William's needs for specialized sexual offender treatment.

IV.

[4]　Finally, DYS contends that the district court's order of 19 July 1988 violates the doctrine of sovereign immunity.

> [T]he sovereign cannot be sued in its own courts or in any other without its consent and permission. . . . An action against a commission or board created by statute as an agency of the State where the interest or rights of the State are directly affected is in fact an action against the State.

*Electric Co. v. Turner*, 275 N.C. 493, 498, 168 S.E.2d 385, 389 (1969).

DYS is an agency of the State of North Carolina, created by statute. *See* N.C.G.S. §§ 134A-1 through -39 (1986), 143B-138 (1990). But the order of 19 July 1988 entered under the district court's statutory authority cannot be characterized either as an injunction, *see Electric Co. v. Turner*, 275 N.C. at 498, 168 S.E.2d at 389, or a suit. Instead, the order was an exercise of the court's statutory mandate to *oversee* disposition of juveniles determined

to be delinquent and thereby order the court's continuing jurisdiction. The court's power and authority to intervene in the release plans of the agency are indisputably incorporated into the Juvenile Code. The Code anticipates such judicial intervention as an aspect of its ongoing, supervisory role over the disposition of delinquent juveniles.

The order of the District Court, Durham County, is, therefore,

Affirmed.